# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

N° 07-CV-3256 (JFB)(GRB)

ROBERT HOUSTON,

Plaintiff,

VERSUS

THOMAS COTTER, JOHN WEISS, AND THE COUNTY OF SUFFOLK,

Defendants.

**MEMORANDUM AND ORDER**
March 27, 2014

JOSEPH F. BIANCO, District Judge:

Plaintiff Robert Houston ("Houston" or "plaintiff") brings this action against defendants Thomas Cotter ("Cotter"), John Weiss ("Weiss"), and the County of Suffolk ("the County") (collectively, "defendants") pursuant to 42 U.S.C. § 1983.[1] Houston's Fourteenth Amendment claim against the County, at issue here, asserts that while incarcerated at the Suffolk County Correctional Facility ("SCCF") and following an assault by Cotter and Weiss, corrections officials unconstitutionally placed and maintained Houston on suicide watch for two weeks—including eight days after mental health professionals determined that Houston was not a suicide risk. Houston claims that there was no credible justification for his placement and maintenance on suicide watch, much less the duration of his placement, and the tangible conditions of his confinement. He asserts that his treatment was the result of the County's deficient policy or custom, whereby inmates could be kept on suicide watch as punishment, with no meaningful oversight, and for reasons other than legitimate mental health concerns. Houston seeks compensatory and punitive damages pursuant to 42 U.S.C. §1983.

The parties cross-move for summary judgment pursuant to Federal Rule of Civil Procedure 56. Defendants argue (1) plaintiff should have filed his claim on or before January 24, 2010, because he at least had reason to know of the County's policy or custom by that time; and (2) regardless, plaintiff did not suffer an atypical and significant hardship in relation to the ordinary incidents of prison life, because he was on suicide watch for two weeks in conditions minimally distinguishable from

---

[1] Plaintiff originally also asserted claims against Douglas Gubitosi, Arthur Thomas, and Gerard Reynolds. Because the amended complaint only brings claims against Cotter, Weiss, and the County, the Court formally dismisses Gubitosi, Thomas, and Reynolds from this action.

1

those on the disciplinary tier. Plaintiff contends that (1) he could not have learned of the County's policy or custom until the deposition of Dr. Thomas Troiano, a psychiatrist, on July 13, 2011; (2) his conditions of confinement gave rise to a constitutional violation; and (3) the evidence establishes that corrections and classifications officials regularly abuse their discretion by using suicide watch to punish difficult inmates. For the following reasons, the Court denies the cross-motions for summary judgment. There are genuine issues of disputed fact that must be resolved as to, *inter alia*, the statute of limitations issue, whether SCCF deprived plaintiff of a state-derived liberty interest when it placed plaintiff on suicide watch in January 2007, and whether a Suffolk County policy, custom, or deliberate indifference caused any resulting injury.

I. BACKGROUND

A. Factual Background

The Court takes the following facts from the parties' affidavits, depositions, exhibits, and Rule 56.1 Statements of Fact. With respect to each motion and the issues raised therein, the Court construes the facts in the light most favorable to the nonmoving party.[2] *See Capobianco v. City of New York*, 422 F.3d 47, 50 (2d Cir. 2005).

On January 11, 2007, an altercation occurred between Houston, then an inmate housed on the disciplinary tier at SCCF,[3] and Cotter and Weiss, then corrections officers. (Pl. 56.1 ¶ 1; Def. 56.1 ¶ 12.) Shortly after the altercation, Officer James Zahn and Sergeant Gerard Reynolds moved Houston to a holding pen. (Pl. 56.1 ¶ 3.) Officer Robert Urban was the on-duty holding pen officer. (*Id.*) At 9:10 a.m., Urban filled out a CF-11 form, which is used to place inmates on suicide watch, for Houston. (*Id.* ¶ 5.) At SCCF, any employee can put an inmate on suicide watch by filling out a CF-11. (*Id.* ¶ 7.) According to the CF-11, Houston had said, "I wish I would have died upstairs when I beat that cop[']s ass. I won't stop beating cops till [sic] they kill me."[4] (*Id.* ¶ 5.) Lieutenant John Krieg signed the CF-11 on January 11, formally placing plaintiff on suicide watch. (*Id.* ¶ 6.) Plaintiff testified that he believes SCCF used the suicide watch to cover up the assault and as a punishment. (Def. 56.1 ¶¶ 6–8.)

Upon placing Houston on suicide watch, SCCF took away Houston's clothing and required him to wear a suicide-safe garment: a sleeveless smock made of coarse, tear-resistant material and Velcro. (*Id.* ¶ 8.) SCCF officers—and Houston—have referred to the garment as a suicide "dress" or "skirt." (*Id.* ¶ 8; Houston Aff. ¶ 3.) Plaintiff, like other suicide watch inmates, could not wear underwear, socks, or any other undergarment with the smock. (Pl. 56.1 ¶ 8.) SCCF then removed Houston to a stripped cell in the Behavioral Modification Housing Unit ("BMHU"). (Def. Counter

---

[2] Although the parties' Rule 56.1 statements contain specific citations to the record, the Court cites to the statements rather than to the underlying citations. Unless otherwise noted, where a party's Rule 56.1 statement is cited, that fact is undisputed or the opposing party has not pointed to any contradictory evidence in the record.

[3] Inmates on the disciplinary tier have restricted privileges, such as a combined one half hour for a shower and telephone call, and up to one hour in the yard. (Def. 56.1 ¶ 14.) They cannot order commissary nor have certain items in their cell, such as a television. (*Id.* ¶ 15.) They have access to medical treatment, the law library, and food. (*Id.* ¶ 16.)

[4] During his deposition, Urban could not remember if plaintiff made this statement, but he testified that the CF-11 form "[i]ndicates that that's what I heard an inmate state to me at that date and time." (Urban Dep. at 94:11–24.) Urban "interpreted that the inmate wanted to die." (*Id.* at 95:4–5.) Houston denies making this statement. (Houston Aff. ¶ 3.)

2

56.1 ¶ 9.) The cell contained a bare mattress and a blanket made out of the same coarse material as the smock, and corrections officers situated immediately in front of the Plexiglass cell window constantly supervised plaintiff.[5] (Pl. 56.1 ¶ 9.) There also is evidence that, the day after the altercation, Weiss monitored Houston.[6] (*See* BMHU Logbook, Pl. Ex. 24 (showing Weiss on shift on January 12).) According to the County, suicide watch inmates have access to the yard, a plastic spoon, a rubberized pen, the law library, showers, razors, and medical and mental health services. (*See* Koelbel Dep. at 227:20–230:10.) Plaintiff, however, claims that he had no showers, telephone calls, prescription medications, food, or access to the law library while in BMHU. (Pl. Counter 56.1 ¶ 17.) It is unclear whether plaintiff suffered these conditions while on suicide watch (*see id.* ¶ 18 (noting that conditions on suicide watch differ from conditions in BMHU)), because plaintiff's Rule 56.1 Statement does not make such representations.

Dr. Troiano observed Houston on January 11 and noted that Houston was "on SW for reasons unknown; apparently he had confrontation w 2 officers today; doesn't appear suicidal and he denies he is – will remain on sw for now." (January 11 Progress Notes, Pl. Ex. 30.) Plaintiff remained on suicide watch for fourteen days, from January 11 until January 24, 2007. (Pl. 56.1 ¶ 11.) SCCF medical personnel, however, found no medical basis for Houston to remain on suicide watch as of January 16. Specifically, Dr. Troiano noted that Houston was alert, verbal, coherent, and with no signs of mental illness. (January 16 Progress Notes, Pl. Ex. 17.) James Graziano, a social worker, stated that Houston "does not appear suicidal and will be removed from suicide watch." (*Id.*) For unknown reasons, an unknown individual overruled the recommendation to remove Houston from suicide watch. (*See* Def. Counter 56.1 ¶ 12.) On January 21, Nurse Practitioner Jane Frith saw Houston, noted that he "states he was [discontinued] from SW [on] 0111607," and contacted classification. (January 21 Progress Notes, Pl. Ex. 18.) Houston remained on suicide watch. On January 24, Dr. Troiano and Graziano saw Houston again, noted that he continued to deny "suicidal ideations," and stated that they would "write another slip attempting to remove him from suicide watch." (January 24 Progress Notes, Pl. Ex. 19.) Houston left suicide watch on January 24.[7]

---

[5] According to John Koelbel, the County's Rule 30(b)(6) witness, the constant supervision ensures that an inmate "doesn't kill himself." (Koelbel Dep. at 158:14–17.)

[6] When asked if SCCF had any policy that would allow a corrections officer involved in an altercation with an inmate to supervise that inmate on suicide watch, Koelbel stated: "That would be at the discretion of the duty lieutenant, but I'll tell you right now that wouldn't happen. . . . It's common sense." (Koelbel Dep. at 234:4–18.) There is no evidence that Weiss observed Houston again.

[7] According to plaintiff's expert, Jorge Baez, Houston remained on suicide watch for more days after a recommendation to remove than ninety-five percent of other inmates who received such a recommendation. (Pl. 56.1 ¶ 14.) Baez's analysis, however, takes into account an earlier period in November 2006 when a mental health professional recommended that Houston be removed from suicide watch the day he was assigned to suicide watch. (*See* Baez Expert Report ¶ 10.) Plaintiff, however, does not challenge the constitutionality of that confinement. It is unclear what impact the additional days from the November 2006 period have on the analysis as it relates to the days of confinement in early 2006, which are at issue in this case.

Baez also found that inmates in disciplinary housing who are on suicide watch remained on suicide watch an average of 3.5 times longer than inmates not in disciplinary housing. (*Id.* at 2; ¶¶ 22–24.) The median inmate on the fourth floor (disciplinary) remained on suicide watch almost four times longer than the median inmate on the second floor (non-

The New York State Sheriff's Association ("NYSSA"), which accredits SCCF, requires annual in-service training on suicide prevention.[8] (Pl. 56.1 ¶ 17.) NYSSA Standard 107 states, *inter alia*, that "matters of medical, mental health, and dental judgment are the sole province of the responsible clinicians." (*Id.* ¶ 18.) Nevertheless, classifications officers at SCCF have the authority and complete discretion to remove inmates from suicide watch. (*Id.* ¶ 15.) Plaintiff has also presented evidence that, based on an interview with inmates that lasts a few minutes, during which no mental health practitioner is present, classifications officers can override a mental health professional's conclusion that an inmate should be removed from suicide watch.[9] (*Id.*) The officers do not need supervisory approval or to document their rationale. (*Id.*) In making the decision to continue or remove an inmate from suicide watch, classifications officers do not have access to an inmate's mental health history, progress notes, or counseling sessions. (*Id.*) The officers also receive no post-academy training in suicide prevention or formal training regarding how to evaluate an inmate to determine if he or she should be removed from suicide watch. (*Id.* ¶ 16.)

### B. Procedural Background

Plaintiff, proceeding *pro se*, filed the complaint alleging excessive force by Cotter, Weiss, Gubitosi, Thomas, and Reynolds on July 26, 2007. Defendants answered on September 19, 2007. Plaintiff requested counsel on November 16, 2009, and the Court denied that motion on November 23, 2009. Counsel was appointed in December 2010, after the case was to proceed to trial on the excessive force claim.

After additional discovery, plaintiff filed an amended complaint on December 16, 2013, alleging, *inter alia*, that the County "knowingly enforced a policy or custom whereby classification officers were permitted to and did overrule, without justification, directives of mental health professionals that an inmate be removed from suicide watch," and "knowingly enforced a policy or custom whereby classification officers kept inmates from suicide watch for reasons other than legitimate mental health concerns, which reasons include to punish an inmate." (Amended Complaint ¶¶ 92–93.) After the Court denied defendants' motion to dismiss on August 10, 2012, defendants answered on September 10, 2012.

Defendants moved for summary judgment on July 26, 2013. Plaintiff filed his cross-motion for summary judgment and his opposition on September 6, 2013. Defendants filed their reply to plaintiffs' opposition and their opposition on October 4, 2013. Plaintiff replied on October 21, 2013. The Court held oral argument on November 1, 2013. The Court has fully considered the submissions of the parties.

### II. STANDARD OF REVIEW

Pursuant to Federal Rule of Civil Procedure 56(a), a court may grant a motion for summary judgment only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Gonzalez v. City of Schenectady*, 728 F.3d 149, 154 (2d Cir. 2013). The

---

disciplinary): eleven days versus three days. (*Id.* at 2.) This statistical comparison is based upon a total of 692 inmates on the second floor, versus 22 inmates on the fourth floor. (*See id.* ¶ 23.)

[8] NYSSA accredited and certified SCCF in 2005, and re-certified SCCF in 2013. (Def. Counter 56.1 ¶ 17.)

[9] For instance, an inmate may be returned to suicide watch despite a recommendation to remove because upon being interviewed, the inmate will tell a classification officer that she remains suicidal. (Def. Counter 56.1 ¶ 15.)

4

moving party bears the burden of showing that he or she is entitled to summary judgment. *Huminski v. Corsones*, 396 F.3d 53, 69 (2d Cir. 2005). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). The court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 122 (2d Cir. 2004) (quoting *Weyant v. Okst*, 101 F.3d 845, 854 (2d Cir. 1996)); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (summary judgment is unwarranted if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party").

Once the moving party has met its burden, the opposing party "'must do more than simply show that there is some metaphysical doubt as to the material facts.... [T]he nonmoving party must come forward with specific facts showing that there is a *genuine issue for trial*.'" *Caldarola v. Calabrese*, 298 F.3d 156, 160 (2d Cir. 2002) (alteration and emphasis in original) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)). As the Supreme Court stated in *Anderson*, "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." 477 U.S. at 249–50 (citations omitted). Indeed, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Id.* at 247–48 (emphasis in original). Thus, the nonmoving party may not rest upon mere conclusory allegations or denials but must set forth "'concrete particulars'" showing that a trial is needed. *R.G. Grp., Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 77 (2d Cir. 1984) (quoting *SEC v. Research Automation Corp.*, 585 F.2d 31, 33 (2d Cir. 1978)). Accordingly, it is insufficient for a party opposing summary judgment "'merely to assert a conclusion without supplying supporting arguments or facts.'" *BellSouth Telecomms., Inc. v. W.R. Grace & Co.*, 77 F.3d 603, 615 (2d Cir. 1996) (quoting *Research Automation Corp.*, 585 F.2d at 33).

III. DISCUSSION

Plaintiff claims the County violated his constitutional rights under 42 U.S.C. § 1983 by unlawfully depriving him of his liberty interest without due process of law through "[t]he stigma and humiliation that [he] experienced as a result of his placement and stay on suicide watch"; "the mere tangible conditions of his confinement"; and because "[t]here was neither a credible justification for his initial placement on suicide watch, nor a reasonable explanation for the eight-day period during which he was kept on suicide watch against the advice of mental health personnel." (Pl. Motion, at 2.)

To state a claim under Section 1983, a plaintiff must allege: (1) the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, (2) by a person acting under the color of state law. 42 U.S.C. § 1983; *see also Snider v. Dylag*, 188 F.3d 51, 53 (2d Cir. 1999). Section 1983 does not itself create substantive rights; it

5

offers "a method for vindicating federal rights elsewhere conferred." *Patterson v. Cnty. of Oneida*, 375 F.3d 206, 225 (2d Cir. 2004). Further, to hold a municipality liable under Section 1983, a plaintiff must show: "(1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right." *Torraco v. Port Auth. of N.Y. & N.J.*, 615 F.3d 129, 140 (2d Cir. 2010) (citations omitted); *see also Monell v. Dep't of Social Servs.*, 436 U.S. 658, 694 (1978).

The Court first considers whether the statute of limitations bars the *Monell* claim. Because the Court concludes that there is, at the least, a genuine issue of material fact as the timeliness of plaintiff's amendment, the Court then proceeds to address the merits.

A. Statute of Limitations

The statute of limitations for a Section 1983 claim arising in New York is three years. *See Lynch v. Suffolk Cnty. Police Dep't, Inc.*, 348 F. App'x 672, 674 (2d Cir. 2009). Although state law provides the statute of limitations period, federal law determines when § 1983 claims accrue. *See Wallace v. Kato*, 549 U.S. 384, 388 (2007). Under federal law, a § 1983 claim accrues "when the plaintiff knows or has reason to know of the injury which is the basis of his action." *Pearl v. City of Long Beach*, 296 F.3d 76, 80, 85 (2d Cir. 2002).

The County asserts that plaintiff's *Monell* claim accrued no later than January 24, 2007, when Houston was removed from suicide watch. The County argues that plaintiff knew, or at least had reason to know, of the custom or policy that allegedly underlies his injury because of his (1) deposition testimony that he believed in January 2007 that he was put on suicide watch as a punishment and to cover up the assault; and (2) August 2007 letter to the Court, in which he said he was "obviously being punished" through his placement on suicide watch. (Def. Motion, at 5–6.) Plaintiff counters that he had no reason to know of SCCF's "suicide watch policy that permitted officers to override the advice of mental health professionals and use suicide watch as punishment" until the deposition of Dr. Troiano in 2011. (Pl. Opp., at 14–16.)

According to the Second Circuit, the discovery rule is not always appropriate for *Monell* claims. In *Pinaud v. County of Suffolk*, 52 F.3d 1139 (2d Cir. 1995), the court explained:

> Since an actionable claim under § 1983 against a county or municipality depends on a harm stemming from the municipality's "policy or custom," a cause of action against the municipality does not necessarily accrue upon the occurrence of a harmful act, but only later when it is clear, or should be clear, that the harmful act is the consequence of a county "policy or custom."

*Id.* at 1157 (internal citation omitted). Thus, a Section 1983 claim against a municipality does not accrue until the plaintiff "knew about, or at least had reason to know about, the policy or custom" upon which she bases the claim.[10] *Id.*; *see also Facciolo v. City of*

---

[10] Other circuits reject this rule. For instance, in the Third Circuit, "[t]he discovery rule does not delay the running of the statute of limitations until a plaintiff is aware of all the facts necessary to bring its cause of action. Under the discovery rule, a claim accrues upon awareness of the *actual injury*, not upon awareness that the injury constitutes a *legal wrong*." *New Castle Cnty. v. Halliburton NUS Corp.*, 111 F.3d 1116, 125 (3d Cir. 1997); *see also Tengood v. City of Philadelphia*, --- F. App'x ---, 2013 WL

6

*New York*, No. CV-09-1332 (DGT)(JMA), 2010 WL 3155251, at *5 (E.D.N.Y. Aug. 6, 2010); *Ruiz v. Suffolk Cnty. Sheriff's Dep't*, 03-CV-3545, 2008 WL 4516222, at *2 (E.D.N.Y. Oct. 2, 2008). Nevertheless, the limitations period for a cause of action against a municipality cannot "run[] anew upon the future discovery of facts tangentially related," rather than sufficiently related, "to a *Monell* claim." *Lawson v. Rochester City Sch. Dist.*, 446 F. App'x 327, 329 (2d Cir. 2011) (affirming holding that discrimination claims were untimely because plaintiff's delayed accrual argument relied upon "subsequent events" that were "insufficiently related to the adverse employment action to form the basis for a determination that" claims were timely); *see Ruiz*, 2008 WL 4516222, at *2 (reasoning that delayed accrual was appropriate where plaintiff could not have learned of facts underlying *Monell* claim that improper hiring practices led to use of excessive force upon inmates until corrections officers testified that they were hired despite having failed psychological test required to become corrections officers).[11]

Applying the "delayed accrual" theory and viewing the evidence and drawing all inferences in the light most favorable to Houston, the Court concludes that a genuine issue of material fact exists with respect to whether plaintiff knew or should have known of the County's policy or custom before January 24, 2010. Therefore, the Court cannot grant summary judgment to the County on statute of limitations grounds. *See Eagleston v. Guido*, 41 F.3d 865, 871 (2d Cir. 1994) (citing *Santiago Hodge v. Parke Davis & Co.*, 909 F.2d 628, 633 (1st Cir. 1990)) (noting, in a Section 1983 case, that "in some circumstances, factual issues related to statute of limitations should be put before a jury"); *Santiago Hodge*, 909 F.2d at 633 (stating that jury must determine whether plaintiffs had sufficient knowledge to trigger statute of limitations because determining when they knew of injury and its connection with defendant's actions was question of fact); *see also Fowler v. Land Mgmt. Groupe, Inc.*, 978 F.2d 158, 162 (4th Cir. 1992) ("In general, issues of fact bearing on the application of a statute of limitations are submitted, as are other issues of fact, for determination by the jury."); *Braune v. Abbott Labs.*, 895 F. Supp. 530, 556 (E.D.N.Y. 1995) ("Statutes of limitations problems raised in complex cases such as the instant one often present factual disputes appropriate for jury resolution. It is

---

2933747, at *4 n.5 (3d Cir. 2013) ("There is also no basis in our precedent for applying such a 'delayed accrual' theory.").

[11] In *Lawson*, a summary opinion, the Second Circuit noted that the language in *Pinaud* is "demonstrably dictum." 446 F. App'x at 329. Notwithstanding that caution from *Lawson*, this Court still looks to the dictum in *Pinaud* for guidance, and chooses to follow that dictum in assessing the current state of the law in the Second Circuit on this issue. The Court also notes that the situation in *Lawson* is distinguishable from the instant case. The district court in *Lawson* found that the plaintiff's racial discrimination claims centered on his disparate treatment claim, and the last actions the defendant took with respect to the plaintiff's employment that could reasonably be factual support for the disparate treatment claim occurred over four years before plaintiff filed his racial discrimination claim. *Lawson v. Rochester City Sch. Dist.*, No. 07-cv-6544, 2010 WL 4174630, at *3 (W.D.N.Y. Oct. 22, 2010). The court reasoned that

any subsequent actions were not reasonably related to the racial discrimination claims and, thus, could not be the basis for determining timeliness. *Id.* By way of contrast, here—as explained *infra*—a reasonable factfinder could conclude that Houston's *Monell* claim arises from Dr. Troiano's testimony, and is not entirely dependent on earlier events. Nothing in the *Lawson* holding undermines a general rule that a *Monell* claim may accrue at the time the plaintiff learns or has reason to know of the existence of a municipal policy or custom that caused the underlying injury. That inquiry is obviously a fact-intensive inquiry that will depend upon the particular circumstances of each case.

7

settled, for example, that the date that a plaintiff constructively discovered his or her 'injury' is a mixed question of fact and law to be determined by the jury.").

Defendants first point to plaintiff's testimony that he thought he was put on suicide watch as a form of punishment and cover up. If all the evidence is construed most favorably to plaintiff, however, a reasonable factfinder could conclude that, although Houston thought he was on suicide watch as a punishment, he did not *know* the County had a policy of placing inmates on suicide watch as a form of punishment. Houston testified that he "didn't know" that the County had such a policy (Houston Dep. at 154:23–155:10), and only found out about a policy after Dr. Troiano's deposition in July 2011 (*id.* at 155:11–22). Dr. Troiano testified that SCCF uses suicide watch as a punishment in certain circumstances, and that classification officers have the authority to remove inmates from suicide watch and sometimes disregard the advice of mental health personnel regarding when to remove an inmate from suicide watch. (Troiano Dep. at 21:21-22:6, 78:12-24, 81:17-82:7.)

Defendants next point to an August 2007 letter. Houston, then *pro se*, wrote:

> I went down to Mental Health *again* today & was *again* cleared by Mental Health doctor T who says *again* Mental Health never placed me on suicide watch to begin with. So why am I still on suicide watch? . . . I'm obviously being punished for som[e] reason. . . . Why am I made to walk around the jail in a suicide watch smok [sic], cuffs & shackles? This treatment is humiliating & unconstitutio[nal].

(August 8 Letter, Pl. Ex. 2, at MITCH 22 (emphasis in original).) Again, if this letter is construed most favorably to plaintiff in light of the entire record, a reasonable factfinder could conclude that, although Houston knew he was being punished, he never thought that suicide watch was used to punish other inmates, too. Houston never mentions other inmates or SCCF practices. Thus, plaintiff can argue, as in *Ruiz*, where the plaintiffs discovered facts supporting an independent *Monell* claim during the deposition of actors involved in the underlying harm, that defendants present no facts clearly suggesting that, until 2011, Houston knew or should have known of the County's potential involvement in the underlying injury.[12]

In short, based upon the evidence contained in the record, the Court concludes that there is a genuine issue of fact as to whether plaintiff had no reason to know of

---

[12] The County also argues that the claim must have accrued because plaintiff knew, or should have known, enough of the "critical facts" of the injury and causation to protect himself by exercising reasonable diligence and seeking legal advice. (Def. Motion, at 4 (citing *Guccione v. United States*, 670 F. Supp. 527, 536 (S.D.N.Y. 1998).) However, knowledge of the "critical facts" of a claim means "knowledge of, or knowledge that could lead to, the basic facts of the injury, i.e., knowledge of the injury's existence and knowledge of its *cause or of the person or entity that inflicted it.*" 670 F. Supp. at 536 (emphasis added) (citing *United States v. Kubrick*, 444 U.S. 111, 122 (1979); *Barrett v. United States*, 689 F.2d 324, 328 (2d Cir. 1982)). Although Houston (as a *pro se* plaintiff) had taken no depositions, served no interrogatories, and made no document requests before the appointment of counsel in 2010, there is a genuine issue of material fact as to whether the record should have given plaintiff any reason to suspect a policy or custom underlay his confinement such that he had "a duty to inquire into the possible existence of a claim in the exercise of due diligence." *Kronisch v. United States*, 150 F.3d 112, 121 (2d Cir. 1998) (noting that "[a] claim does not accrue when a person has a mere hunch, hint, suspicion, or rumor of a claim").

8

the existence of the *Monell* claim until Dr. Troiano's deposition, such that the statute of limitations did not accrue until 2011. Accordingly, the Court denies summary judgment to the County on statute of limitations grounds.[13]

B. Merits of Plaintiff's Due Process Challenge

Plaintiff alleges that the County unlawfully deprived him of his liberty interest without due process of law by "implementing a policy whereby corrections officers were permitted to place and keep [plaintiff] on restrictive and degrading suicide watch without any reasonable basis, solely as malicious retaliation, over the contrary recommendations of mental health professionals." (Pl. Motion, at 9.) To prevail on this procedural due process claim under Section 1983, plaintiff must show that (1) he possessed a protected liberty interest and (2) the County deprived him of that interest as a result of insufficient process. *See, e.g., Arce v. Walker*, 139 F.3d 329, 333 (2d Cir. 1998) (citing *Ky. Dep't of Corr. v. Thompson*, 490 U.S. 454, 460 (1989)); *Bedoya v. Coughlin*, 91 F.3d 349, 351–52 (2d Cir. 1996).

For the reasons discussed in detail below, to the extent plaintiff argues that the stigmatization from suicide watch automatically creates a liberty interest arising directly under the Due Process Clause any time a prisoner is placed on suicide watch, the Court disagrees. The Court concludes, however, based on the record before it, that a genuine dispute of material fact exists as to whether plaintiff's conditions of confinement on suicide watch imposed an atypical and significant hardship on him in relation to the ordinary incidents of prison life, such that it implicates his state-derived liberty interest as described under Second Circuit case authority.

1. Violation of a Protected Liberty Interest

Inmates' liberty interests derive from two sources: (1) the Due Process Clause itself or (2) state statutes or regulations. *Arce*, 139 F.3d at 333. The Supreme Court, however, "has narrowly circumscribed [the scope of the Due Process Clause itself] to protect no more than the 'most basic liberty interests in prisoners,'" *id.* (quoting *Hewitt v. Helms*, 459 U.S. 460, 467 (1983)), limiting it to freedom from restraints that "exceed[] the sentence in . . . an unexpected manner," *Sandin v. Conner*, 515 U.S. 472, 478 (1995). Thus, the Due Process Clause does not protect against every change in the conditions of confinement that has an adverse effect on inmates, so long as the change is "'within the normal limits or range of custody which the conviction has authorized the State to impose.'" *Arce*, 139 F.3d at 333–34 (quoting *Sandin*, 515 U.S. at 484); *see Sandin*, 515 U.S. at 479 n.4 (observing that proscribed conditions of confinement must be "qualitatively different from the punishment characteristically suffered by a person convicted of crime, and [have] stigmatizing consequences" (citation and internal quotation marks omitted)); *Vitek v. Jones*, 445 U.S. 480, 493 (1980) (holding that "involuntary commitment to a mental hospital" is outside the standard range of conditions of confinement of a prison sentence).

State statutes and regulations also confer liberty interests on prisoners. *Arce*, 139 F.3d at 334. A prisoner's confinement or restraint violates a state liberty interest if it "imposes

---

[13] As noted *supra*, the proper procedure is not to submit the legal question of the statute of limitations to the jury; rather, the Court intends to utilize a special verdict sheet that will allow the jury to decide the disputed factual issue. Once the factual issue is decided, the Court will rule on the statute of limitations question as a matter of law.

9

[an] atypical and significant hardship on an inmate in relation to the ordinary incidents of prison life."[14] *Palmer v. Richards*, 364 F.3d 60, 64 (2d Cir. 2004) (quoting *Sandin*, 515 U.S. at 484).

Plaintiff claims that (1) his placement on suicide watch exposed him to the humiliation of erroneous mental health confinement and thus violated his rights under the Due Process Clause itself; and (2) in the alternative, his confinement imposed atypical and significant hardships compared with normal prison life. The County counters that nothing indicates Houston endured unusual conditions on suicide watch. The Court addresses each prong.

a. Liberty Interest Arising Under the Due Process Clause

According to plaintiff, placing him on suicide watch violated his liberty interests under the Due Process Clause because the "stigmatizing nature of suicide watch is exactly the kind of qualitatively different restraint that gives rise to a protected liberty interest." (Pl. Reply, at 7.) Under this theory, any placement on suicide watch inherently implicates the Due Process Clause because of the stigmatization alone. The Court disagrees as a matter of law.

According to the Supreme Court, the challenged restraint must "exceed[] the sentence in such an unexpected manner . . . to give rise to protection by the Due Process Clause of its own force." *Sandin*, 515 U.S. at 484. Thus, an inmate's liberty interest is implicated under the Due Process Clause itself only when the conditions of confinement are "qualitatively different" from general prison conditions. *Vitek*, 445 U.S. at 493. In the mental health context, courts have found violations of Due Process Clause-derived interests where inmates are involuntarily committed to a mental health facility, with its attendant stigma and compelled treatment, or are placed in a facility or ward with similar characteristics. *See, e.g., id.* at 493–94; *United States v. Frierson*, 208 F.3d 282, 283 (1st Cir. 2008); *Nolley v. Cnty. of Erie*, 776 F. Supp. 715, 737–38 (W.D.N.Y. 1991); *see also Saunders v. Gomez*, No. 97-1728, 1998 WL 668178, at *1 (9th Cir. Sept. 18, 1998) (reasoning that hearing was necessary before inmate was transferred to psychiatric management unit at state medical facility); *Warren v. Harvey*, 632 F.2d 925, 931 (2d Cir. 1980) ("Next to the actual deprivation of liberty, the greatest harm to a person erroneously committed to a mental institution is the stigma attached *to the commitment*." (emphasis added)). Standing alone, however, "changes in the conditions of confinement having a substantial adverse impact on the prisoner" are insufficient to invoke the protections of the Due Process Clause if the conditions are within the

---

[14] A prisoner also must show that the state created a liberty interest before the prisoner can show that the prison infringed that interest. *Palmer*, 364 F.3d at 64 n.2. The parties do not address this requirement, but that is of no consequence. First, "New York state law creates a liberty interest in not being confined to [Special Unit Housing ("SHU")]." *Palmer*, 364 F.3d at 64 n.2 (citation and internal quotation marks and alterations omitted). Second, to the extent there is a question as to the applicability of cases about disciplinary conditions, courts consistently apply *Sandin* to disciplinary segregation, administrative detention, and other forms of "discretionary confinement" that are "within the range of confinement to be normally expected" by a prisoner. *Nwaokocha v. Sadowski*, 369 F. Supp. 2d 362, 373 (E.D.N.Y. 2005) (citation omitted); *see also Arce*, 139 F.3d at 335 (refusing to distinguish between prison restraints imposed for disciplinary and administrative purposes). Houston contends that his suicide watch was an unjustified punishment, but he does not argue that suicide watch cannot "be normally expected" by a prisoner during confinement or question courts' application of the "atypical and significant hardship" principle to suicide watch. Thus, the state law requirement is met, and the SHU segregation cases can guide the analysis.

10

sentence imposed. *Vitek*, 445 U.S. at 493.

In *Vitek*, the Supreme Court held that a felon "is entitled to the benefit of procedures appropriate in the circumstances before he is found to have a mental disease and transferred to a mental hospital." *Id.* The Court reasoned that "the stigmatizing consequences of a transfer to a mental hospital for involuntary psychiatric treatment" and "the subjection of the prisoner to mandatory behavior modification as a treatment for mental illness[] constitute the kind of deprivations of liberty that requires procedural protections." *Id.* at 494. In *Frierson*, the First Circuit explained that "[i]nvoluntary commitment to a federal medical center removes a prisoner from the general prison population and attaches to him or her a certain stigma." 208 F.3d at 283. Thus, the court held that the inmate-plaintiff should have been at his commitment hearing before his involuntary transfer to the mental hospital. *Id.* In *Nolley*, decided before *Sandin*, the court considered the confinement of an inmate in administrative segregation in a female ward for HIV+ and suicidal and psychologically unstable inmates. 776 F. Supp. at 737. The court found the confinement "qualitatively different from the punishment normally suffered by a person convicted of a crime" because the inmate was housed in the ward immediately upon entering the facility during each of her three confinements, never received any administrative review prior to or during the confinements, and was subject to stigma and to "the kinds of pressures an inmate would face in a mental hospital." *Id.* at 737–38.

Viewing the facts and drawing inferences in the light most favorable to the County, the Court concludes that plaintiff cannot establish the deprivation of a liberty interest arising directly under the Due Process Clause. The Court does not discount that being on suicide watch stigmatized plaintiff and, in general, engenders adverse consequences. Standing alone, however, the stigmatization from being assigned to suicide watch at a prison facility does not make that classification "exceed[] the sentence in such an unexpected manner . . . to give rise to protection by the Due Process Clause of its own force." *Sandin*, 515 U.S. at 484; *cf. Earl v. Racine Cnty. Jail*, 718 F.3d 689, 691 (7th Cir. 2013) ("When an inmate is placed in conditions more restrictive than those in the general prison population, whether through protective segregation like suicide watch or discretionary administrative segregation, his liberty is affected only if the more restrictive conditions are particularly harsh compared to ordinary prison life or if he remains subject to those conditions for a significantly long time.").

Plaintiff cites to no authority (and the Court could not find any) holding that placement on suicide watch, by itself, violates a protected interest arising directly under the Due Process Clause. *See, e.g.*, *Cherer v. Frazier*, No. 2:06-CV-502-PMP-LRL, 2007 WL 2406844, at *6 (D. Nev. Aug. 16, 2007) ("Prisoners have no liberty interest arising directly from the Fourteenth Amendment Due Process clause in avoiding a transfer to more adverse confinement conditions." (citing *Meachum v. Fano*, 427 U.S. 215, 224–25 (1976))), *aff'd* 465 F. App'x 681 (9th Cir. 2012). More importantly, plaintiff does not question that "segregation on a justified suicide watch" is "within the range of confinement to be normally expected by a prisoner," or that prison officials should be "encouraged to attend to mental health considerations rather than being penalized for having done so." *Nwaokocha*, 369 F. Supp. 2d at 373 (noting "the emotional and psychological challenge that prison imposes on mentally ill inmates, and the sometimes severe effects that can result[—]including, but not limited to,

inmate suicides and harm to others"). Nor does plaintiff—who does not claim that he received no medical review before or during his placement—more broadly argue that any confinement to suicide watch must be preceded by notice, an adversary hearing before an independent decisionmaker, and legal assistance, which are the typical protections courts have required after finding a liberty interest directly under the Due Process Clause. *See, e.g., Saunders*, 1998 WL 668178, at *1. In addition, unlike in *Vitek*, plaintiff never went to a separate mental health facility. And unlike in *Nolley*, there is no evidence from which a reasonable factfinder could conclude that plaintiff, while on suicide watch, was "subject to the kinds of pressures an inmate would face in a mental hospital." *See* 776 F. Supp. at 737–38 (reasoning that pressures were similar because inmates repeatedly tried to kill themselves, spoke in gruesome detail about crimes, and ate out of garbage).

Therefore, as a matter of law, plaintiff's stigmatization from the suicide watch did not, in itself, create a liberty interest arising directly under the Due Process Clause.

b. "Atypical and Significant Hardship"

The Court next considers whether Houston's experience on suicide watch violated a state-derived liberty interest. As set forth below, as in *Palmer*, there are genuine issues of disputed fact in the instant case regarding his conditions of confinement that preclude this issue from being decided on summary judgment.

i. Legal Standard

A prisoner's liberty interest is implicated by a disciplinary or administrative confinement only if the confinement "imposes [an] atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Palmer*, 364 F.3d at 64 (quoting *Sandin*, 515 U.S. at 484). The court must look to the actual punishment in making this determination. *Id.* at 64 (citing *Scott v. Albury*, 156 F.3d 283, 287 (2d Cir. 1998)). Factors to aid in determining whether the inmate endured an "atypical and significant hardship" include (1) the effect of the confinement on the length of incarceration, (2) the extent to which the conditions of the disciplinary segregation differ from other routine prison conditions, and (3) the duration of the disciplinary segregation compared to discretionary confinement. *Palmer*, 364 F.3d at 64 (quoting *Wright v. Coughlin*, 132 F.3d 133, 136 (2d Cir. 2008)). The court may resolve the issue of atypicality as a matter of law only when the conditions are uncontested. *Id.* at 65.

There is no bright-line rule that establishes a length of disciplinary confinement beyond which a due process right is implicated. *Id.* According to the Second Circuit, restrictive confinements of fewer than 101 days, like plaintiff's, generally do not raise a liberty interest warranting protection, but "could constitute atypical and significant hardships if the conditions were more severe than the normal SHU conditions . . . or a more fully developed record showed that even relatively brief confinements under normal SHU conditions were, in fact, atypical." *Id.*; *see also Davis v. Barrett*, 576 F.3d 129, 133–34 (2d Cir. 2009) (same). Thus, to determine if an inmate confined to disciplinary housing for a relatively short period of time endured an "atypical and significant hardship," the court must examine the conditions of confinement "in comparison to the hardships endured by prisons in general population, as well as prisoners in administrative and protective confinement, assuming such confinements are imposed in the ordinary course of prison

12

administration." *Davis*, 576 F.3d at 134 (quoting *Welch v. Barrett*, 196 F.3d 389, 392–93 (2d Cir. 1999)); *see also Wheeler v. Butler*, 209 F. App'x 14, 16 (2d Cir. 2006) ("If [the] conditions, taken in totality, were especially harsh vis-à-vis both the conditions in the segregated confinement and in the general prison population, they may violate a liberty interest despite the comparative shortness of the confinement." (citation and internal quotation marks and alterations omitted)). Absent a detailed factual record, courts typically affirm dismissals of due process claims where the period of time spent in SHU was short— *e.g.*, thirty days—and there was no indication of unusual conditions. *E.g.*, *Palmer*, 364 F.3d at 66.

ii. Application

According to plaintiff, his confinement in suicide watch gave rise to a protected liberty interest because, unlike inmates in the general population, he was deprived of all clothing and bedding except for a suicide smock and a blanket made of similar material; was subjected to constant observation, including one day with Weiss; remained on suicide watch for fourteen days, including eight days after mental health personnel recommended that he leave suicide watch; and felt stigmatized and "less than human," especially because he knew he was not suicidal. (Pl. Motion, at 21–23.) The County counters that, because of the duration of the suicide watch, the Court must (1) consider whether plaintiff's conditions on suicide watch are unusual as compared to the conditions normally experienced by an inmate on suicide watch or (2) compare plaintiff's conditions to those on SCCF's disciplinary tier—where plaintiff was housed before being placed on suicide watch—and not to those in the general population. (Def. Motion, at 9–10.) Under either analysis, the County argues that the confinement was constitutional.

As set forth below, the Court concludes that it cannot resolve the issue of atypicality at this juncture, because the conditions plaintiff suffered are unclear. *See Palmer*, 364 F.3d at 65–66 (affirming denial of summary judgment where prison detailed "normal" SHU conditions but plaintiff's affidavit raised questions as to conditions under which he was confined and how they compared to those for general population).

As a threshold matter, there is no evidence that the confinement affected the length of plaintiff's incarceration. In addition, the duration of plaintiff's stay on suicide watch does not in itself implicate a liberty interest. *See, e.g.*, *Ortiz v. McBride*, 380 F.3d 649, 654 (2d Cir. 2004) (reasoning that with respect to "normal" SHU confinement, 101-day confinement does not meet *Sandin* standard of atypicality). The Court nevertheless must compare plaintiff's suicide watch conditions with those in the disciplinary tier and in the general population. *See, e.g.*, *Earl*, 718 F.3d at 691 (comparing conditions in "protective segregation like suicide watch" to those in "ordinary prison life" even where inmate was "placed on suicide watch only for five days, which generally is too short a time to trigger due-process protection"). Even assuming *arguendo* that the confinement initially was a "justified suicide watch," *Nwaokocha*, 369 F. Supp. 2d at 373, nothing in the record clearly establishes that the time on suicide watch after January 16 was "justified." Thus, to limit the comparison to suicide watch would insulate any purported SCCF policy from judicial scrutiny because plaintiff does not claim his suicide conditions were "unusually harsh" compared to those of other suicide watch inmates. As discussed below, if plaintiff's conditions on suicide watch are compared to the general prison population, or even compared to

13

those on the disciplinary tier (where plaintiff was housed prior to the suicide watch), there are genuine issues of disputed fact based on the current record as to whether the suicide watch conditions were an "atypical and significant hardship."

Although the Second Circuit has not "delineate[d] the precise contours of 'normal' SHU confinement," it has noted that, "ordinarily, SHU prisoners are kept in solitary confinement for twenty-three hours a day, provided one hour of exercise in the prison yard per day, and permitted two showers per week."[15] *Ortiz*, 380 F.3d at 655 (citing *Palmer*, 364 F.3d at 65 n.3; N.Y. Comp. Codes R. & Regs. tit. 7, §§ 304.1–.14, 305.1–.6). According to the County, inmates on suicide watch have access to a yard and the law library, a plastic spoon for food, rubberized pens, showers, shaving, razors, mail, and medical and mental health services. (*E.g.*, Koelbel Dep. at 227–30; Krieg Dep. at 109–13.) Suicide watch inmates have more restrictions to their freedom, a suicide garment (a sleeveless smock made of tear-resistant material and Velcro) and blanket, a bare mattress in a stripped cell, and constant supervision. (Koelbel Dep. at 231:11–17.)

It is clear that whether these types of conditions, in combination, are sufficient to implicate a liberty interest is a very fact intensive inquiry. *Compare Palmer*, 364 F.3d at 66 (finding genuine disputes as to harshness of conditions despite short confinement where inmate in SHU claimed he was deprived of all property, was mechanically restrained whenever he was escorted, and could not correspond with family); *Ortiz*, 380 F.3d at 655 (concluding that plaintiff adequately alleged that conditions during ninety days in SHU were "far inferior" to others and "atypical and significant" because he was kept in SHU for twenty-four hours a day, was not permitted daily exercise, and was prevented from showering "for weeks at a time"); *Stewart v. Armstrong*, No. 98-60024, 1999 WL 152940, at *1, 3 (5th Cir. Feb. 19, 1999) (affirming judgment for plaintiff where prison afforded no due process before officers took his underwear, shoes, mattresses, sheets, blankets, mail, and toiletries for twenty days; gave him a paper gown to wear; and turned water off for seventy-two hours); *Erle v. Dominguez*, No. 2:09-CV-88-TLS, 2011 WL 781528, at *1, 5–6 (N.D. Ill. Feb. 28, 2011) (denying motion to dismiss where plaintiff alleged he was naked and in cell for eleven days with fecal matter and urine on walls, gusting air conditions, and no mattress or cushion), *with Earl*, 718 F.3d at 689 (finding no unusually harsh conditions where inmate in suicide watch for five days was given a mattress and suicide-proof blanket, denied writing materials, and had deputies assigned to closely and personally monitor him to ensure his safety); *Reynolds v. Mattson*, No. 2:07-CV-59, 2008 WL 2704750, at *1 (W.D. Mich. July 9, 2008) (finding no cruel and unusual punishment where inmate was handcuffed, stripped of clothing, not allowed any bedding, and only wore suicide prevention gown, even if such actions were not for legitimate purpose).

Moreover, plaintiff also asserts that, while in the BMHU, he could not shower, make telephone calls, keep food or drink, have access to the law library, or receive prescription medications. (*See* Pl. Counter 56.1 ¶ 17; August 8 Letter, at MITCH 21–23 (stating, *inter alia*, that he was denied these items and was in cuffs and shackles).) He also felt humiliated, degraded, and "less than human" because of the stigmatization, other

---

[15] Plaintiff does not contend that his general disciplinary tier conditions were unconstitutional.

14

inmates' knowledge of his situation, Weiss's presence,[16] plaintiff's knowledge that he was not suicidal, and the fact that he remained on suicide watch for eight days after mental health personnel recommended removal. Such facts, if proven in combination with the other alleged conditions of confinement, may distinguish plaintiff's confinement from that in *Earl* or *Reynolds* and render it "an atypical and significant hardship" that implicates a liberty interest protected by state law. *Cf. Sandin*, 515 U.S. at 479 n.4 (giving weight to "stigmatizing consequences" of confinement). In addition, the County points to no authority holding that continued confinement in suicide watch without justification, for allegedly punitive reasons, is the "sort of confinement that inmates should reasonably anticipate receiving at some point in their incarceration." *Hewitt v. Helms*, 459 U.S. 460, 468 (1983).

Therefore, given the factual disputes regarding the precise conditions of plaintiff's comparatively short confinement, it cannot be determined at this juncture whether plaintiff endured unusually harsh conditions that constituted an "atypical and significant" deprivation under *Sandin*. Both sides have provided sufficient evidence to create genuine issues of disputed fact that must be resolved a trial before such a determination can be made. Accordingly, the Court denies the cross-motions for summary judgment on this ground.

c. Existence of a Municipal Policy, Custom, or Deliberate Indifference That Caused Plaintiff's Injury

---

[16] To the extent that the parties dispute whether Weiss observed Houston alone on January 12 (*see* Def. Counter 56.1 ¶ 10), the material fact is that the observation occurred after the altercation and before medical personnel cleared Houston as non-suicidal.

Plaintiff argues that summary judgment is warranted in his favor on the *Monell* claim because, according to him, "there is no genuine question of material fact that while Mr. Houston was incarcerated at Suffolk County Correctional Facility ("SCCF"), he was subjected to abusive treatment that rose to the level of a constitutional violation." (Pl. Motion, at 1.) For the reasons set forth *supra* and below, the Court disagrees and concludes this claim cannot be resolved on summary judgment.

A municipal entity may be held liable under Section 1983 where the plaintiff demonstrates that the constitutional violation complained of was caused by a municipal "policy or custom." *Monell*, 436 U.S. at 694 (noting that municipal policy must be the "moving force of the constitutional violation"); *see also Patterson*, 375 F.3d at 226. "The policy or custom need not be memorialized in a specific rule or regulation." *Kern v. City of Rochester*, 93 F.3d 38, 44 (2d Cir. 1996) (citing *Sorlucco v. N.Y.C. Police Dep't*, 971 F.2d 864, 870 (2d Cir. 1992)). Instead, constitutional violations by government officials that are "persistent and widespread" can be "so permanent and well settled as to constitute a custom or usage with the force of law, and thereby generate municipal liability." *Sorlucco*, 971 F.2d at 870–71 (citing *Monell*, 436 U.S. at 691) (internal quotation marks omitted). In addition, a policy, custom or practice of the entity may be inferred where "'the municipality so failed to train its employees as to display a deliberate indifference to the constitutional rights of those within its jurisdiction.'" *Patterson*, 375 F.3d at 226 (quoting *Kern*, 93 F.3d at 44). Municipal training is actionable where, "in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional

rights, that the policymakers of the [municipality] can reasonably be said to have been deliberately indifferent to the need." *City of Canton v. Harris*, 489 U.S. 378, 390 (1989); *see also Ortiz v. Goord*, 276 F. App'x 97, 98 (2d Cir. 2008) ("Defendants may be held liable under § 1983 if they . . . exhibited deliberate indifference to a known injury, a known risk, or a specific duty, and their failure to perform the duty or act to ameliorate the risk or injury was a proximate cause of plaintiff's deprivation of rights under the Constitution." (citation and quotation marks omitted)).

The entity, however, is only liable where the entity *itself* commits a wrong; "a municipality cannot be held liable under § 1983 on a *respondeat superior* theory." *Monell*, 436 U.S. at 691; *see also Segal v. City of N.Y.*, 459 F.3d 207, 219 (2d Cir. 2006) ("*Monell* does not provide a separate cause of action for the failure by the government to train its employees; it extends liability to a municipal organization where that organization's failure to train, or the policies or customs that it has sanctioned, led to an independent constitutional violation.").

According to plaintiff, the County's policy or custom "enabled any SCCF employee to put an inmate on suicide watch as punishment with no meaningful oversight, and allowed classifications officers – not mental health professionals – complete, unsupervised control over when inmates were removed from suicide watch." (Pl. Motion, at 1.) Plaintiff also argues that the County is deliberately indifferent to the need for and lack of training of SCCF officers with respect to suicide watch because the need for more training is so "obvious," especially given how classifications officers govern suicide watch. (*Id.* at 14–16.)

Because plaintiff has failed to establish a protected liberty interest as a matter of law at this juncture, he cannot demonstrate on summary judgment that constitutional violations occurred pursuant to a custom or policy at SCCF. *See Mercado v. City of New York*, 08 Civ. 2855 (BSJ)(HP), 2011 U.S. Dist. LEXIS 140430, at *26 (S.D.N.Y. Dec. 5, 2011) (because there was "no independent, underlying" Eighth Amendment violation, there was "no basis for municipal or supervisory liability"). In any event, although the County concedes the existence of a custom or policy as to SCCF's general suicide watch practices (*see* Def. Counter 56.1 ¶¶ 5, 7, 15, 16), there is sufficient evidence to create genuine issues of fact as to the existence of a policy or custom of unjustifiably overriding mental health recommendations and using suicide watch to punish inmates for disciplinary issues, deliberate indifference as to deficiencies in any policy, and causation.[17]

i. Initial Classification

First, to the extent that plaintiff's claim is premised on SCCF's initial removal of inmates to suicide watch, the Court finds genuine issues of material fact regarding the nature of any policy and causation.

Plaintiff does not seriously challenge SCCF's use of a CF-11 form (*see generally* Pl. Motion, at 11–17 (focusing on removal from suicide watch)), mental health personnel evaluate inmates as soon as possible after removal (*e.g.*, January 11 Progress Notes (taken on day of removal)), and courts recognize that "it is important that prison officials be encouraged to attend

---

[17] To some extent, plaintiff's theory assumes both a policy with an underlying punitive motive, and a policy of deliberate indifference to any purported deficiencies in SCCF's practices. The Court considers both alleged policies.

16

to mental health considerations rather than be penalized for having done so," *Nwaokocha*, 369 F. Supp. 2d at 374. More importantly, Baez's report does not discuss motive and only indicates that from 2006–2007, 22 disciplinary tier inmates were on suicide watch, and 692 general population inmates were on suicide watch. (Baez Expert Report ¶ 22.) In fact, there is no evidence in the record about other inmates' CF-11 forms or initial suicide watch evaluations—including plaintiff's November 2006 CF-11, that someone told Urban to remove plaintiff to suicide watch as punishment, or that Urban placed Houston in suicide watch because of his reputation. (*Contra* Pl. Reply, at 10 (arguing that there is ample evidence that extended stay on suicide watch was motivated by punishment because, *inter alia*, plaintiff had reputation for being difficult and officers used suicide watch to punish difficult inmates).). Dr. Troiano also did not recommend plaintiff's removal from suicide watch on January 11.

Thus, construing the evidence most favorably to defendants, there is a sufficient basis to create a dispute as to the propriety of plaintiff's or other inmates' initial removal to suicide watch, such that plaintiff is not entitled to summary judgment on this issue. Accordingly, at this juncture, the Court cannot conclude as a matter of law that SCCF's initial classification policy exists, is deficient, and injured plaintiff.

ii. Continued Confinement to Suicide Watch

Second, Plaintiff argues that there is no genuine dispute that SCCF has a policy to ignore mental health professionals and use suicide watch as a punishment, or is deliberately indifferent to a need for suicide training to avoid such decisionmaking, because: (1) officers do not speak with mental health professionals before overriding a removal order; (2) thirty-nine percent of all inmates on suicide watch remained on it for at least one day after a removal recommendation; (3) inmates on suicide watch who were also in disciplinary housing were left on suicide watch on average three-and-a-half times as long as other inmates, especially if they were repeat offenders; and (4) Dr. Troiano stated that SCCF officers used suicide watch to punish. (Pl. Motion, at 12–14.) The Court disagrees, and again concludes that this issue cannot be decided on summary judgment.

The County has argued that there are gaps in plaintiff's evidence and the reasonable inferences that could be drawn from that evidence. For instance, a correlation between the amount of time an inmate spends on suicide watch with that inmate's disciplinary status does not necessarily show causation. *See, e.g., Gilks v. Olay Co.*, 30 F. Supp. 2d 438, 443 (S.D.N.Y. 1998) ("Mere use of the product and subsequent injury . . . are not a sufficient basis from which to infer causation."). The County notes that Baez did not consider why an inmate is placed or kept on suicide watch, and an inmate could be left on suicide watch because she acts or says she is suicidal after convincing a medical professional otherwise.

Further, the Court does not consider Dr. Troiano's testimony to be an "ample fact[] concerning [inmates'] treatment at the hands of [corrections officers] from which the jury, in conjunction with the statistical evidence," could *only* infer that an intent to punish resulted in prolonged confinement on suicide watch. *Sorlucco*, 971 F.2d at 872 (explaining that small statistical sample, in conjunction with other evidence, could support inference of discriminatory practice). In other words, while a jury could reasonably draw such an inference based on the evidence in this case, it is not the only

17

reasonable inference available. Counsel asked Dr. Troiano whether "suicide watch is ever used as a form of punishment." (Troiano Dep. at 81:17–18.) Dr. Troiano answered "yes," and when asked "in what circumstances it's used that way," he responded: "As in the case I just mentioned, if somebody is manipulating a situation by saying they're suicidal when they're not, they might be left on after we've taken them off. And when they get uncomfortable, they might just be left on for an extra couple of days." (Id. at 81:21–82:5.) When asked if officers communicate why they have overridden him, Dr. Troiano said they do not "ever tell [him] that it's a matter of punishment." (Id. at 82:18–83:4.) Thus, he knows it is a "punishment" because the officers say, "This fellow's been on and off, on and off, on and off. We are keeping him on. I interpret it to be that. They don't say, We are punishing him." (Id. at 83:2–11.) Thus, defendants could try to argue to the jury, in conjunction with other evidence, that Troiano's definition of a "punishment" really pertains to situations where an inmate misleads mental health personnel and classification officers regarding his or her suicidal ideations, rather than a broader disciplinary practice.

In short, based upon the record, there is a material question of fact as to whether there is a policy to leave disciplinary tier or general population inmates on suicide watch as punishment and not for a legitimate reason. Accordingly, the Court must deny summary judgment to plaintiff because there is a genuine dispute as to whether the County had a custom or policy, or was deliberately indifferent to a practice, to use suicide watch as "malicious retaliation."

Such disputed factual issues also preclude a finding, at the summary judgment stage, that the County was deliberately indifferent to a need to further train or supervise its employees. First, there is a disputed factual issue as to whether the statistics could not put the County on notice of any deficiency in SCCF's policy or custom. Further, although plaintiff argues that the training at SCCF failed to meet industry standards in effect in 2007, NYSSA accredited SCCF in 2005 and reaccredited it in 2013. Moreover, at this juncture, there is no basis to conclude that the suicide watch policy inherently is unconstitutional in any application, such as where there is clear evidence of suicidal ideations or a classification officer makes a reasonable judgment based on an inmate's conduct.[18] Cf. Nwaokocha, 369 F. Supp. 2d at 373.

For similar reasons, there are genuine disputes as to causation. There are no documents as to who left plaintiff on suicide watch, and why. The absence of any documentary evidence, standing alone, cannot establish plaintiff's case beyond question. Although there is sufficient evidence in the record, if plaintiff's evidence is credited and all reasonable inferences are drawn in plaintiff's favor, to conclude that plaintiff was placed and maintained on suicide watch for punitive purposes pursuant to a SCCF policy, that is not the only reasonable inference from the facts, especially if they are construed in the light most favorable to defendants. In other words, there is sufficient evidence in the record to create a material issue of fact as to whether the confinement was punitive— placing it within the ambit of the alleged policy—or the result of negligence—taking it outside of the ambit of the alleged policy or liability for deliberate indifference. See Salahuddin v. Goord, 467 F.3d 263, 280 (2d Cir. 2006) ("Deliberate indifference is a mental state equivalent to subjective

---

[18] Indeed, plaintiff does not challenge his 2006 suicide watch even though Dr. Troiano advised that plaintiff be removed from suicide watch right away.

recklessness .... The reckless official need not desire to cause such harm or be aware that such harm will surely or almost certainly result. Rather, proof of awareness of a substantial risk of the harm suffices. But recklessness entails more than mere negligence; the risk of harm must be substantial and the official's actions more than merely negligent."); *Hayes v. N.Y.C. Dep't of Corr.*, 84 F.3d 614, 620 (2d Cir. 1996) (in Eighth Amendment context, explaining that to determine whether prison official's actions or omissions rise to deliberate indifference requires plaintiff to demonstrate, *inter alia*, that officials possessed sufficient culpable intent).

In sum, although plaintiff proffers evidence and arguments that could establish that a deficient municipal policy or custom, or deliberate indifference, caused the deprivation of his liberty interests without due process in January 2007, the Court must consider the facts and draw all reasonable inferences in favor of the County at the summary judgment stage. Under that standard, there is sufficient evidence—and a lack of evidence—to raise genuine issues of material fact concerning the causes of plaintiff's confinement to suicide watch. Accordingly, the Court denies summary judgment to plaintiff on this ground as well.

IV. CONCLUSION

For the foregoing reasons, the Court denies the cross-motions for summary judgment in their entirety.

SO ORDERED.

---

JOSEPH F. BIANCO
United States District Judge

Dated: March 27, 2014
Central Islip, NY

\*\*\*

Plaintiff is represented by Christopher Denicola, Laura Zuckerwise, Sarah Edwards, Stewart Dearing, and Victor Hou, of Clearly Gottlieb Steen & Hamilton LLP, One Liberty Plaza, New York, NY 10006. Defendants are represented by Brian Mitchell, Assistant County Attorney, Office of the Suffolk County Attorney, 100 Veterans Memorial Highway, P.O. Box 6100, Hauppauge, NY 11788.