UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

———————————————
№ 07-CV-3256 (JFB) (AYS)
———————————————

ROBERT HOUSTON,

Plaintiff,

VERSUS

THOMAS COTTER, JOHN WEISS, AND THE COUNTY OF SUFFOLK,

Defendants.
———————————————

**MEMORANDUM AND ORDER**
March 30, 2016
———————————————

JOSEPH F. BIANCO, District Judge:

Plaintiff Robert Houston ("plaintiff" or "Houston") brings this action against defendants Thomas Cotter ("Cotter"), John Weiss ("Weiss"), and the County of Suffolk ("the County") (collectively "defendants") pursuant to 42 U.S.C. § 1983. Plaintiff commenced this action on July 26, 2007, by filing a *pro se* complaint against defendants Cotter and Weiss, alleging that corrections officers used excessive force against him on January 11, 2007. Counsel was subsequently appointed to represent plaintiff, and an amended complaint was filed on December 16, 2011, in which plaintiff added a claim against the County, alleging that it was liable for implementing a policy whereby corrections officers confined him to suicide watch for two weeks as punishment in violation of his due process rights.

This case was tried before a jury from February 23, 2015 to March 9, 2015. The claims submitted to the jury were as follows: a claim of excessive force against Officers Cotter and Weiss, and a claim that Suffolk County violated plaintiff's due process rights pursuant to *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978).

On March 9, 2015, the jury reached a verdict, finding in favor of the plaintiff as to (1) his excessive force claim against Officer Cotter, awarding $1,000 in compensatory damages and $4,000 in punitive damages, and (2) his *Monell* claim against the County, awarding $25,000 in compensatory damages. (*See* Jury Verdict, ECF No. 165.) The jury found that Officer Weiss was not liable on the excessive force claim. (*Id.*)

Presently before the Court is the defendants' motion for judgment as a matter of law under Rule 50(b) of the Federal Rules of Civil Procedure. Defendants assert that they are entitled to judgment as a matter of

law on the *Monell* claim because the verdict was against the weight of the evidence.[1] For reasons set forth below, the motion for judgment as a matter of law is denied.

The Court further concludes that the County's argument that the *Monell* claim against it was outside the statute of limitations, which was raised in the defendants' summary judgment motion, fails because: (1) a Section 1983 claim against a municipality does not accrue until the plaintiff knew about, or at least had reason to know about, the policy or custom upon which he bases the claim (and the jury found that plaintiff did not know and should not have known, prior to January 24, 2010, that the County had a policy, practice or custom of using suicide watch as punishment for inmates); and (2) in the alternative, the *Monell* claim relates back to the date of plaintiff's initial complaint against the individual defendants under Rule 15(c)(1)(C).

I. MOTION FOR JUDGMENT AS A MATTER OF LAW

A. Standard of Review

The standard governing motions for judgment as a matter of law pursuant to Rule 50 is well-settled. A court may not properly grant judgment as a matter of law under Rule 50 against a party "unless the evidence, viewed in the light most favorable to the nonmoving party, is insufficient to permit a reasonable juror to find in his favor." *Arlio v. Lively*, 474 F.3d 46, 51 (2d Cir. 2007) (citing *Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp.*, 136 F.3d 276, 289 (2d Cir. 1998)). Generally, a court reviewing such a motion must defer to all credibility determinations and reasonable inferences that the jury may have drawn at trial. *See Frank Sloup & Crabs Unltd., LLC v. Loeffler*, 745 F. Supp. 2d 115, 120 (E.D.N.Y. 2010). That is, a court considering a Rule 50 motion "may not itself weigh the credibility of witnesses or consider the weight of the evidence." *Meloff v. N.Y. Life Ins. Co.*, 240 F.3d 138, 145 (2d Cir. 2001) (quoting *Galdieri-Ambrosini*, 136 F.3d at 289); *see also Playtex Prods., Inc. v. Procter & Gamble Co.*, 02 Civ. 8046 (WHP), 2004 WL 1658377, at *2 (S.D.N.Y. July 26, 2004) ("A Rule 50(b) motion cannot be granted 'if, drawing all reasonable inferences in favor of the nonmoving party and making all credibility assessments in his favor, there is sufficient evidence to permit a rational juror to find in his favor.'" (quoting *Sir Speedy, Inc. v. L&P Graphics, Inc.*, 957 F.2d 1033, 1039 (2d Cir. 1992)).

Thus, judgment as a matter of law is appropriately granted where "(1) there is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or (2) there is such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded [persons] could not arrive at a verdict against [it]." *Advance Pharm., Inc. v. United States*, 391 F.3d 377, 390 (2d Cir. 2004) (alterations in original) (quoting *Galdieri-Ambrosini*, 136 F.3d at 289); *see also Kinneary v. City of N.Y.*, 601 F.3d 151, 155 (2d Cir. 2010) (same); *This is Me, Inc. v. Taylor*, 157 F.3d 139, 142 (2d Cir. 1998) (stating that a court assessing a Rule 50 motion must consider whether "the evidence is such that, without weighing the credibility of witnesses or otherwise considering the weight of the evidence, there can be but one conclusion as to the verdict that reasonable [persons] could have reached" (alteration in original) (quoting *Cruz v. Local Union No. 3, Int'l Bhd. of Elec. Workers*, 34 F.3d 1148, 1154-

---

[1] Defendants have not moved with regard to the verdict against Officer Cotter.

55 (2d Cir. 1994))). In other words, this Court may only grant defendant's Rule 50(b) motion "if it cannot find sufficient evidence supporting the jury's verdict." *Playtex Products*, 2004 WL 1658377, at *2; *see also Black v. Finantra Capital, Inc.*, 418 F.3d 203, 209 (2d Cir. 2005) ("A court evaluating [] a motion [for judgment as a matter of law] cannot assess the weight of conflicting evidence, pass on the credibility of the witnesses, or substitute its judgment for that of the jury.") (citation and internal quotation marks omitted). For this reason, a party moving to set aside a jury verdict must clear "a high bar." *Lavin-McEleney v. Marist College*, 239 F.3d 476, 479 (2d Cir. 2001).

B. Discussion

The Court assumes familiarity with the underlying facts and procedural history of the case, which are set forth more fully in the Court's March 27, 2014 Memorandum and Order, *Houston v. Cotter*, 7 F. Supp. 3d 283 (E.D.N.Y. 2014). The Court reserves recitation of the facts presented at trial for the discussion below.

Defendants challenge the jury's finding of *Monell* liability against the County. Defendants argue that (1) plaintiff failed to establish that he was subjected to an underlying constitutional violation, specifically, (a) that the evidence failed to demonstrate that the conditions of plaintiff's confinement were such that they gave rise to a protected liberty interest, and (b) that there was no proof as to why plaintiff was kept on suicide watch after the recommendation by mental health that be removed, and (2) plaintiff failed to establish (a) deliberate indifference due to a failure to train or supervise, or (b) a direct link between the claimed violation and an official County policy.

1. Underlying Constitutional Violation

a. Conditions of Confinement

Defendants argue that the conditions under which plaintiff was confined while on suicide watch in the disciplinary area known as BMHU cannot, as a matter of law, be considered unusual or especially harsh. In particular, defendants argue that other than the fact that plaintiff was required to wear a suicide garment, was given a suicide blanket and had no bed linens, the remaining conditions were "related to his disciplinary confinement" in the BMHU unit, (Defs.' Mem. at 12), as opposed to his "status of being placed on suicide watch." (Defs.' Reply at 5.) Thus, defendants argue that these other conditions should not be considered when determining if plaintiff was subjected to atypical or significant hardship. (*Id.*) In opposition, plaintiff argues that all the conditions he experienced while on suicide watch in the BMHU should be considered because his entire placement in the BMHU was punitive and "part and parcel of the retaliatory effort against him." (Pl.'s Opp. at 12.)

As an initial matter, the Court reaffirms its prior determination that the proper method of comparison is between "plaintiff's suicide watch conditions with those in the disciplinary tier and in general population." *Houston,* 7 F. Supp. 3d at 299; *see also Earl v. Racine County Jail*, 718 F.3d 689, 691 (7th Cir. 2013) ("When an inmate is placed in conditions more restrictive than those in the general prison population, whether through protective segregation like suicide watch or discretionary administrative segregation, his liberty is affected only if the more restrictive conditions are particularly harsh compared or ordinary prison life or if he remains subject to those conditions for a significantly long time.").

Further, the Court concludes that the jury could have reasonably believed that plaintiff

3

offered sufficient evidence to demonstrate that his entire placement in the BMHU was retaliatory. In particular, plaintiff testified that, on January 10, 2007, Officer Cotter told him to "shut up" and, when plaintiff continued talking, Officer Cotter told him "You're going to keep talking like that? I'll tell you what, go to yard tomorrow, see what happens." (Tr. 205.)[2] Plaintiff testified that he understood the statement as a "threat." (Tr. 205-06.) Plaintiff further testified that, when he was returning to his tier from yard time on January 11, 2007, he was assaulted by Officer Cotter and other officers. (Tr. 207-217.) Officer Cotter subsequently filed disciplinary charges against plaintiff, claiming that the altercation occurred because plaintiff attempted to attack him, (Tr. 607; Pl.'s Ex. 14),[3] and plaintiff was thereafter placed on suicide watch in the BMHU. (Tr. 227-28; Pl.'s Ex. 21.) Under these circumstances, the Court concludes that the jury could have reasonably believed that the entire incident that led plaintiff to be placed on suicide watch was part of a larger scheme of retaliation. Thus, it would be improper to consider only the additional conditions of confinement that suicide watch added to the BMHU conditions. Accordingly, the Court will consider all of the conditions experienced by plaintiff while on suicide watch in the BMHU unit in comparison to the conditions of inmates in the disciplinary tier and in the general population. When the evidence of plaintiff's conditions while on suicide watch in the BMHU are compared to those in the disciplinary tier and general population, the jury could reasonably find that plaintiff suffered an atypical and significant hardship.

As previously articulated in the Court's opinion denying the cross-motions for summary judgment,[4] a prisoner's liberty interest is implicated by a disciplinary or administrative confinement only if the confinement "imposes [an] atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Palmer v. Richards*, 364 F.3d 60, 64 (2d Cir. 2004) (quoting *Sandin v. Connor*, 515 U.S. 472, 484 (1995)). Factors to aid in determining whether the inmate endured an "atypical and significant hardship" include (1) the effect of the confinement on the length of incarceration, (2) the extent to which the conditions of the disciplinary segregation differ from other routine prison conditions, and (3) the duration of the disciplinary segregation compared to discretionary confinement. *Wright v. Coughlin*, 132 F.3d 133, 136 (2d Cir. 1998); *see also Palmer*, 364 F.3d at 64. Although restrictive confinements of fewer than 101 days generally do not implicate a liberty interest warranting protection, they "could constitute atypical and significant hardships if the conditions were more severe than the normal SHU conditions." *Palmer*, 364 F.3d 60; *see also Davis v. Barrett*, 576 F.3d 129, 133 (2d Cir. 2009) (same). In considering whether an inmate subject to disciplinary housing for a short period of time endured an "atypical and significant hardship," the court must consider the conditions of the plaintiff's confinement "in comparison to the hardships endured by prisons in general population, as well as prisoners in administrative and protective confinement, assuming such confinements are imposed in the ordinary course of prison administration." *Davis*, 576 F.3d at 134 (quoting *Welch v. Barrett*, 196 F.3d 389, 392-93 (2d Cir. 1999)); *see also Wheeler v. Butler*, 209 F. App'x 14, 16 (2d Cir. 2006) ("If [the] conditions, taken in totality, were

---

[2] Tr. refers to the trial transcript.
[3] Pl.'s Ex. refers to an exhibit introduced by plaintiff during the trial.

[4] The Court restates the applicable law, but a fuller recitation of the law can be found in the Court's March 27, 2014 Opinion. *See Houston*, 7 F. Supp. 3d at 283.

4

especially harsh vis-à-vis both the conditions in the segregated confinement and in the general prison population, they may violate a liberty interest despite the comparative shortness of the confinement." (citation and internal quotation marks and alterations omitted)).

At trial, it was established that, during his suicide watch, plaintiff was required to wear only a suicide smock, whereas the other prisoners, including those in the BMHU for purely disciplinary reasons, wore normal clothing such as pants and shirts. (Tr. 228-30, 295-96, 617-18, 633.) Also, unlike the inmates in the general population and disciplinary tier, plaintiff was given a suicide blanket, made of the same material as the smock, and a bare mattress, but not allowed to have other blankets, sheets, or a pillow. (Tr. 231, 618, 633, 764.) Plaintiff was also required to sleep in a suicide watch cell with a plexiglass side so that an officer could observe him at all times. (Tr. 230-33, 675-76.) Testimony further indicated that, while on suicide watch, plaintiff was unable to participate freely in yard time, and instead, could only go in a smaller, individual cage, and was cuffed and shackled when going to and from the cage. (Tr. 236-238; 911-913.) Plaintiff further testified that "everybody would see [him]" when he would walk from the building to the cage and that they made derogatory comments toward him regarding mental illness such as "bug out" because the suicide smock "brought attention." (Tr. 238-41.) Toni Bair, plaintiff's expert witness in professional correctional management, testified that requiring inmates to wear suicide smocks, a "form of a dress," is "humiliating and degrading" in the macho world of prisons. (Tr. 1011-13.)

Plaintiff also offered evidence to indicate that he was not in fact suicidal when he was placed on suicide watch in January 2007. Notably, none of the log entries recorded by officers who observed him constantly while he was on suicide watch from January 11, 2007 through January 23, 2007, noted that plaintiff exhibited any signs of suicidal behavior. (*See* Pl.'s Ex. 21.) The mental health professionals who evaluated plaintiff on January 11, 2007, the date that he was placed on suicide watch, and January 16, 2007, also reported that he did "not appear suicidal" on either date. (Pl.'s Exs. 25, 45; *see also* Tr. 755, 767-68.) Plaintiff also denied being suicidal to the mental health professional during both of his evaluations, (Pl.'s Exs. 25, 45; *see also* Tr. 755-57, 767-68), and testified at trial that he "knew [he] wasn't suicidal" when he was placed on suicide watch. (Tr. 228.) Plaintiff further denied making the statement "I wish I would have died upstairs when I beat that cops ass, I won't stop beating cops till they kill me," which defendants attributed to him in the CF 11 form that placed plaintiff on suicide watch. (Tr. 225-26, 759-61; Pl.'s Ex. 23.)[5]

Further, plaintiff's statistical expert, Mr. Jorge Baez, testified that plaintiff's fourteen days on suicide watch was five times longer than that of the median three day stay of an inmate on suicide watch. (Tr. 842.) Mr. Baez also testified that, by remaining on suicide watch for eight days after mental health professionals requested removal, plaintiff remained on suicide watch 95 percent longer than other inmates who mental health professionals requested be removed. (Tr. 844-45.)

In sum, the Court concludes that there was sufficient evidence to support the jury's finding that plaintiff suffered an atypical and

---

[5] At trial, Dr. Troiano testified that this statement "could be interpreted" as a suicidal statement. (Tr. 759.) However, plaintiff introduced Dr. Troiano's prior deposition testimony, in which he stated that such a statement did not show any self-destructive intent. (Tr. 760-61.)

significant hardship due to the conditions of his confinement.

### b. Suicide Watch as Punishment

Defendants further argue that the evidence fails to establish that "plaintiff was kept on suicide watch after the recommendation of mental health that he be removed because of an intentional or reckless act by a member of the Suffolk County Correctional Facility, or that the decision (if there was one) was to punish the plaintiff." (Defs' Mem. at 14.)[6] Defendants contend that "there are a number of reasons why the plaintiff may have been left on suicide watch" and thus, "[t]o reach a conclusion that the plaintiff was kept on suicide watch for punishment requires more than an inference that a rational juror could draw and would be nothing more than speculation." (*Id.*)

Plaintiff argues that there is substantial evidence from which a reasonable jury could find that he was confined to suicide watch as punishment. In particular, he argues that the evidence established that "the entire reason he was put on suicide watch in January 2007 was punishment for being difficult." (Pl.'s Opp. at 16.) Plaintiff further argues that unrebutted expert statistical evidence by Mr. Baez demonstrated that plaintiff had a particularly long suicide watch compared to other inmates and, thus, further supports the jury's finding that the motivation for the suicide watch was punitive. (*Id.* at 17-18.)

As discussed *supra*, plaintiff testified that he was assaulted after he failed to heed Officer Cotter's threat, (Tr. 205-17), and that following the incident, Officer Cotter filed disciplinary charges against plaintiff in which he claimed that the altercation occurred because plaintiff attempted to attack him. (Tr. 607; Pl.'s Ex. 14.) After the altercation, plaintiff was placed on suicide watch in the BMHU. (Tr. 227-28; Pl.'s Ex. 21.) Thus, plaintiff certainly offered sufficient proof that he was placed on suicide watch as punishment, and in the absence of any alternate explanation, a jury could reasonably infer that he was kept on suicide watch as punishment.

Further, as discussed *supra*, plaintiff denied being suicidal throughout his time on suicide watch, classification officers assigned to monitor him never noted that he exhibited any signs of suicidal behavior, and mental health professionals who evaluated him reported that he did not appear suicidal. (*See, e.g.,* Pl.'s Exs. 21, 25, 45; Tr. 755, 757, 766-68.) Thus, a reasonable jury could certainly find that plaintiff was not suicidal when he was kept on suicide watch after mental health professionals recommended removal and, thus, that he was being confined to suicide watch as punishment.

In addition, at trial, plaintiff's counsel cross-examined Dr. Thomas Troiano and asked whether suicide watch was used as punishment at jail. When Dr. Troiano asserted that suicide watch was not used as a form of punishment, plaintiff's counsel impeached him with his prior deposition testimony in which he answered affirmatively when asked if suicide watch was "ever used as a form of punishment." (Tr. 783-785; Troiano Dep. at 81-82.) This deposition testimony was also introduced as substantive evidence. (Tr. 788-89.) Further, Sergeant Koelbel acknowledged that plaintiff

---

[6] In his opposition brief, plaintiff argues that defendants waived their argument that plaintiff was kept on suicide watch as punishment by failing to make it in their pre-verdict motion for judgment as a matter of law. (*See* Pl.'s Opp. at 16.) However, when defendants made a pre-verdict motion for judgment as a matter of law at trial, Mr. Mitchell stated, "There is nothing here - - there is no evidence that indicates why Mr. Houston was kept on suicide watch." (Tr. 1106.) Thus, the Court finds that this argument was not waived.

had a "reputation for being a difficult inmate." (Koelbel Dep. at 249, Court Ex. B.)

Plaintiff also offered evidence that indicated overlapping involvement between officers involved in the January 11, 2007 incident and those involved in his suicide watch. In particular, Lieutenant Krieg signed the CF-11 form, which placed plaintiff on suicide watch, and also assigned Officer Weiss to monitor plaintiff's suicide watch less than 24 hours after the incident, in which Officer Weiss was involved. (*See* Pl.'s Ex. 11, at 11, Pl.'s Ex. 21 at 24, Pl.'s Ex. 23; Tr. 918-21.) Further, Officer Zahn, the officer who presided over plaintiff's disciplinary hearing, testified that he personally witnessed the January 11, 2007 incident, though he was not "directly involved." (Tr. 1139-40.) Officer Zahn also testified that he brought his involvement in the incident to Lieutenant Krieg's attention, and Krieg was "fine with it." (Tr. 1140.)

Further, as discussed *supra*, Mr. Baez testified that plaintiff's fourteen days on suicide watch was five times longer than the median inmate stay of three days on suicide watch. (Tr. 842.) Mr. Baez also testified that the eight days that plaintiff remained on suicide watch after mental health professionals recommended that he be removed was longer than that of 95 percent of inmates who had been ordered removed. (Tr. 844-45.) Such statistical analysis further supports the jury's finding that plaintiff was kept on suicide watch as punishment. *Cf. Luciano v. Olsten Corp.*, 110 F.3d 210, 216 (2d Cir. 1997) (finding district court properly denied motion for judgment as a matter of law where plaintiff offered "statistical data which reflected a glass ceiling at the Company and disparity of pay," supporting her claim of discrimination).

Thus, based upon this evidence, the Court finds that a jury could have reasonably found that plaintiff was kept on suicide watch as punishment.

Further, although defendants argue that "there are a number of reasons why the plaintiff may have been left on suicide watch, including that the classification unit may not have even been notified that mental health was recommending his removal," (Defs.' Mem. at 14), "[w]hen the evidence is viewed in the light most favorable to [plaintiff] and all inferences are drawn in [his] favor, a reasonable jury was not *compelled* to find for defendants." *Cash v. County of Erie*, 654 F.3d 324, 339 (2d Cir. 2011); *see also Zellner v. Summerlin*, 494 F.3d 344, 370-71 (2d Cir. 2007) ("[A] court may grant a motion for judgment as a matter of law 'only if it can conclude that, with credibility assessments made against the moving party and all inferences drawn against the moving party, a reasonable juror would have been *compelled* to accept the view of the moving party.'") (quoting *Piesco v. Koch*, 12 F.3d 332, 342 (2d Cir. 1993)). Although defendants offered alternative possibilities for why plaintiff was remained on suicide watch, their own witness, Sergeant Koelbel, testified that no records were kept as to why inmates are kept on suicide watch after mental health professionals recommend removal. (Tr. 898-99.) Thus, this is not a situation where there is a "complete absence of evidence supporting the verdict" or where "there is such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded [persons] could not arrive at a verdict against it." *Advance Pharm., Inc.*, 391 F.3d 390 (alterations in original). Instead, a jury weighing the evidence presented could have reasonably concluded that plaintiff was subjected to suicide watch as punishment and, thus, the jury's verdict was not against the weight of the evidence.

2. Municipal Liability

Defendants further argue that plaintiff failed to establish that "any Suffolk County policymakers exercised 'deliberate indifference' to the rights of plaintiff." (Defs.' Mem. at 17.) In particular, defendants argue that no evidence indicated that "persons at the policy-making level within the jail were even aware of the use of suicide watch as a punishment or that there was a history of employees mishandling the situation." (*Id.*) Defendants further argue that no evidence was presented to establish that policymakers believed that there was a need for better training or supervision, or that the County made a "conscious choice" not to provide such training or supervision. (*Id.* at 17-18.)

Plaintiff argues that defendants do not dispute that the evidence permitted a finding that Suffolk County had a custom of using suicide watch of punishment, and further, that the evidence confirms the reasonableness of such a finding. (Pl.'s Opp. at 19.) Plaintiff further argues that the evidence was also sufficient to find municipal liability due to inadequate training and/or supervision because Suffolk County failed to provide adequate suicide watch training even though classification officers "see suicide watches all the time." (*Id.* at 21.) Plaintiff additionally argues that deliberate indifference is established by the fact that SCCF employees have a history of keeping inmates on suicide watch after mental health professionals recommend their removal. (*Id.* at 22.)

At trial, the jury was instructed that there were three ways to find defendant municipally liable in the action: if plaintiff was deprived of his constitutional rights due to: (1) "the result of an [official] practice or custom of Suffolk County that was in place even though such practice or custom had not necessarily received formal approval through Suffolk County's official decision-making channels"; (2) "inadequate training of Suffolk County employees"; or (3) "inadequate supervision of Suffolk County employees." (Tr. 1368; *see also* Jury Instructions and Verdict Sheet – Final Version, at 31, ECF 158.) The Court emphasized that "Suffolk County may be held liable if any one of these theories of liability is proven by plaintiff." (Tr. 1368; Jury Instructions and Verdict Sheet – Final Version, at 31.) Here, defendants only claim that the evidence was insufficient for a reasonable jury to find for plaintiff as to the failure to train or supervise theories of liability. (*See* Defs.' Mem. at 16-18; Defs.' Reply at 7-8.) Defendants do not argue that plaintiff failed to establish liability due to an official policy and, in fact, conceded, both in their post-trial briefing and at trial, that a jury could have inferred the existence of an official municipal policy from the evidence presented. (*See* Defs.' Mem. at 14-15, 18; Tr. 1106.)[7] Instead, they claim that plaintiff failed to demonstrate a causation between the alleged policy and claimed violation. (Defs.' Mem. at 18-19.) However, in an abundance of caution, the Court will examine all three theories of municipal liability.

---

[7] Because the verdict sheet made no distinction between the three ways of finding that plaintiff proved a violation of his constitutional rights, and because the law provides that a unanimous verdict on any one of the three theories would be sufficient to hold Suffolk County liable, plaintiff need only prove one theory by preponderance of the evidence. *Cf. Indu Craft, Inc. v. Bank of Baroda*, 47 F.3d 490, 496 (2d Cir. 1995) (reversing grant of judgment as a matter of law where "jury's special verdict sheet made no distinction between the two methods of proving damages" and the evidence of one method "standing alone, would have been sufficient to support the jury's award" even though there was insufficient proof presented as to the other theory).

8

### a. Municipal Practice or Custom

#### i. Legal Standard

A municipal entity may be held liable under Section 1983 where the plaintiff demonstrates that the constitutional violation complained of was caused by a municipal "policy or custom." *Monell*, 436 U.S. at 694 (noting that municipal policy must be the "moving force of the constitutional violation"); *see also Patterson v. County of Oneida, N.Y.*, 375 F.3d 206, 226 (2d Cir. 2004). "The policy or custom need not be memorialized in a specific rule or regulation." *Kern v. City of Rochester*, 93 F.3d 38, 44 (2d Cir. 1996) (citing *Sorlucco v. N.Y.C. Police Dep't*, 971 F.2d 864, 870 (2d Cir. 1992)). Instead, constitutional violations by government officials that are "persistent and widespread" can be "so permanent and well settled as to constitute a custom or usage with the force of law, and thereby generate municipal liability." *Sorlucco*, 971 F.2d at 870-71 (citing *Monell*, 436 U.S. at 691) (internal quotation marks omitted).

#### ii. Application

Plaintiff presented evidence that Dr. Troiano admitted that suicide watch was sometimes used as a form of punishment at SCCF. (Tr. 783-785; Troiano Dep. at 81-82.) Plaintiff further elicited testimony that classification officers have the "power to override mental health professional's determination that an inmate is not suicidal and should be taken off of suicide watch" and that ultimately, "classification officers are the ones who decide whether to remove inmates from suicide watch." (Tr. 896.) Mr. Bair, plaintiff's professional correctional management expert, testified that to allow classification officers to override the decisions of mental health professionals as to suicide risk is "beyond understanding" and contrary to the standards of the New York State Sheriffs' Association ("NYSSA") for Sheriffs' Corrections Divisions, which require that a clinician make medical decisions. (Tr. 1026-28.) Further, Mr. Baez testified that based on his statistical evidence, 35 percent of inmates remained on suicide watch for at least one more day after mental health requested removal and 16 percent of inmates remained on suicide watch for three or more days after mental health requested removal. (Tr. 844.) Mr. Baez also testified that inmates on the disciplinary floor (the BMHU) who were placed on suicide watch remained on suicide watch about four times longer than those inmates placed on suicide watch on the second floor, where male inmates on suicide watch were otherwise placed. (Tr. 836-37.)

Based upon the trial evidence, the Court concludes that the jury could reasonably find that defendant Suffolk County had a policy or custom of using suicide watch as punishment.

### b. Inadequate Training and/or Supervision

#### i. Legal Standard

A municipal entity may also be held liable under Section 1983 under for a failure to train or supervise its employees "if the failure amounts to 'deliberate indifference' to the rights of those with whom the [municipal] employees interact." *Wray v. City of New York*, 490 F.3d 189, 195 (2d Cir. 2007). A policy, custom, or practice of the entity may be inferred where "'the municipality so failed to train its employees as to display a deliberate indifference to the constitutional rights of those within its jurisdiction.'" *Patterson*, 375 F.3d at 226 (quoting *Kern*, 93 F.3d at 44). Deliberate indifference exists where the plaintiff establishes that (1) "a policymaker knows 'to a moral certainty' that [municipal] employees will confront a particular situation"; (2) "the situation either presents the employee with 'a difficult choice of the sort that training or supervision will

make less difficult,' or 'there is a history of employees mishandling the situation'"; and (3) "the wrong choice by the [municipal] employee will frequently cause the deprivation of a citizen's constitutional rights." *Wray*, 490 F.3d at 195-96 (quoting *Walker v. City of New York*, 974 F.2d 293, 297-98 (2d Cir. 1992)); *see also Cash v. Cty. of Erie*, 654 F.3d 324, 334 (2d Cir. 2011) (same); *City of Canton, Ohio v. Harris*, 489 U.S. 378, 390 (1989) (stating that municipal training is actionable where, "in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the [municipality] can reasonably be said to have been deliberately indifferent to the need"). The plaintiff must show the "policymaker's inaction was the result of 'conscious choice' and not 'mere negligence.'" *Cash*, 654 F.3d at 334 (quoting *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 128 (2d Cir. 2004)); *Ortiz v. Goord*, 276 F. App'x 97, 98 (2d Cir. 2008) ("Defendants may be held liable under § 1983 if they . . . exhibited deliberate indifference to a known injury, a known risk, or a specific duty, and their failure to perform the duty or act to ameliorate the risk or injury was a proximate cause of plaintiff's deprivation of rights under the Constitution." (internal citation and quotation marks omitted)).

ii. Application

At trial, plaintiff offered evidence that classification officers encounter suicide watches on a regular basis, but do not receive adequate training to handle such watches. Sergeant Koelbel testified that classification officers "see suicide watches all the time," that "[t]hey come up quite often," and that they were part of the "normal course of business." (Tr. 938.) Such testimony was sufficient for a jury to find that Suffolk County "knew to a moral certainty that its employees" would confront suicide watches in the course of their employment.

As to the second part of the inquiry, plaintiff elicited testimony that classification officers do not receive mental health training on a regular basis, but rather, rely instead on "on the job training." (*See* Tr. 936-37; 958-59, 1178.) Further, Mr. Baer testified that such "on the job training" was not sufficient and that it is "absolutely critical that all corrections officers who deal with inmates receive not only the initial training on suicide watch and recognition and prevention as they do in their initial academy, but they have ongoing annual training as well." (Tr. 1014-15.) Mr. Baer further testified that SCCF failed to comply with mandatory NYSSA standards by failing to provide a minimum of twenty-one hours of annual in-service training for its staff, including training dedicated to suicide-crises prevention. (Tr. 1017-19; *see also* Pl.'s Ex. 27 at 14.) Thus, the Court concludes that plaintiff has shown sufficient evidence for the jury to reasonably find that employees' difficult decisions would be made easier with training. *See Hogan v. Franco*, 896 F. Supp. 1313, 1322 (N.D.N.Y. 1995) (finding plaintiff presented adequate evidence for the jury to find liability due to failure to train where there was testimony that officers received only "on the job" training and "no formal training").

Further, plaintiff has shown sufficient evidence to the jury to enable them to reasonably find that there was a failure to supervise. Sergeant Koelbel testified that a classification officer who overrides a mental health determination that an inmate should be removed from suicide watch is not required to get approval from a supervisor, put his rationale in writing for a supervisor to review, or otherwise explain his decision to anyone. (Tr. 900.) Due to plaintiff's

aforementioned evidence regarding classification officers' lack of mental health training, a jury could reasonably find that defendant Suffolk County was deliberately indifferent with respect to supervising its employees by allowing largely untrained classification officers to override the decisions of mental health professionals.

Additionally, as discussed *supra*, 35 percent of inmates remained on suicide watch for at least one more day after mental health requested removal and 16 percent of inmates remained on suicide watch for three or more days after mental health requested removal, (Tr. 844), which could support a rational finding of employees mishandling the situation. Such testimony provides an alternative theory of liability due to a record of employees' mishandling the removal of inmates from suicide watch. *Cf. Hogan*, 896 F. Supp at 1323 (holding plaintiff presented adequate evidence of history of officers "abusing prisoners or mishandling situations" through emergency room doctor's testimony that he saw 1-2 cases per month of individuals claiming assault by police).

As to the final part of the test – "that the wrong choice by the city employee will frequently cause the deprivation of a citizen's constitutional rights" – a jury could reasonably find that confining an inmate to suicide watch without justification can, depending on the surrounding circumstances, constitute a due process violation and thus, cause the deprivation of inmate's constitutional rights. *See Palmer*, 364 F.3d at 64.

In sum, the Court concludes that, given the trial evidence, the jury could have certainly found that the defendant Suffolk County was deliberately indifferent by failing to adequately train or supervise its officers but allowing them to make the ultimate decision as to whether an inmate should remain on suicide watch.

### c. Causation

#### i. Legal Standard

In order for a *Monell* claim to succeed, a plaintiff must "prove that the municipality was, in the language of the statute, the 'person who . . . subject[ed], or cause[d] [him] to be subjected,' to the deprivation of constitutional rights." *Vippolis v. Haverstraw*, 768 F.2d 40, 44 (2d Cir. 1985) (alterations in original). In other words, with respect to causation, for a plaintiff to prove municipal liability under § 1983, "[a]t the very least there must be an affirmative link between the policy and the particular constitutional violation alleged." *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823 (1985).

#### ii. Application

Here, defendants argue that the causation element of the *Monell* claim is lacking because there was "no evidence of why the plaintiff was kept on suicide watch on January 16, 2007, and even if one were to assume that the reason he was kept on suicide watch was for punishment, this could have been due to the individual employee's failure to follow the training he received." (Defs.' Mem. at 18.) Their causation argument largely tracks their argument that there was a lack of evidence regarding suicide watch being used as punishment. (*See* Defs.' Reply at 9 ("[T]he lack of evidence of why the plaintiff was kept on suicide watch not only prevents any reasonable jury from concluding that the plaintiff was indeed kept on suicide watch as punishment, it also creates a void between the alleged policy and the claimed constitutional violation such that the necessary element of causation is entirely missing and unsupported.").)

As an initial matter, to the extent that defendants argue that the "lack of evidence of why plaintiff was kept on suicide watch" means that there was not sufficient evidence for the jury to infer that the conduct was caused by a County policy, it is undisputed that no records are kept as to why inmates are kept on suicide watch when classification officers override the decisions of mental health professionals. (*See, e.g.*, Tr. 898-99.) However, as discussed *supra*, plaintiff offered a variety of evidence at trial that supported his argument that he was confined to suicide watch as punishment based on defendants' custom, as well as due to inadequate training and supervision. Further, for purposes of defendants' Rule 50 motion, the Court must defer to all reasonable inferences that the jury may have drawn at trial. *See, e.g.*, *Frank Sloup & Crabs Unltd., LLC*, 745 F. Supp 2d at 120. Thus, particularly in the absence of any other explanation as to why plaintiff remained on suicide watch, the Court finds that the jury could reasonably conclude that causation was present as to any of the three theories of municipal liability.

As to the first theory of liability – based an official practice or custom – plaintiff presented testimony that he was placed on suicide watch following the altercation with the officers, (Tr. 227-28; Pl.'s Ex. 21), was not in fact suicidal at any time that he was on suicide watch, (Tr. 757, 767-68, Pl.'s Exs. 25, 45), and was kept on suicide watch after mental health professionals recommended removal. (Tr. 228.) Further, plaintiff offered testimony that he was considered a difficult inmate, and corrections officers sometimes used suicide watch to punish difficult inmates. (Tr. 785; Court Ex. B at 249.) Under these circumstances, the Court concludes that the jury could reasonably conclude that defendant Suffolk County's custom of using suicide watch as punishment caused his confinement on suicide watch.

Further, the Court concludes that the evidence permitted a finding that inadequate training and/or supervision caused his confinement. As discussed *supra*, plaintiff offered testimony that classifications officers do not receive regular mental health training, (Tr. 936-37; 958-59; 1178), but rather, rely on "on the job training," which Mr. Bair testified is contrary to NYSSA standards. (Tr. 1017-19.) Further, classifications officers testified that they were permitted to override mental health professionals' determinations as to whether inmates should remain on suicide watch. (Tr. 896.) Thus, when considered in conjunction with the fact that plaintiff remained on suicide watch eight days after mental health professionals recommended removal, a jury could reasonably find that defendant Suffolk County's inadequate training and/or supervision of its classification officers caused plaintiff to be kept on suicide watch.

## II. STATUTE OF LIMITATIONS

In 2013, Suffolk County moved for summary judgment, *inter alia*, on the ground that the Section 1983 claim against the County – namely, that there was an unconstitutional policy to use suicide watch as a punishment for inmates, including plaintiff – was outside the applicable three-year statute of limitations. In particular, the County argued that plaintiff's claim accrued on and between January 11, 2007 and January 24, 2007, but plaintiff did not file the amended complaint until December 16, 2011 (after counsel was appointed to represent him). In its Memorandum and Order, dated March 27, 2014, the Court held that "a Section 1983 claim against a municipality does not accrue until the plaintiff knew about, or at least had reason to know about, the policy or custom upon which she bases the claim." *Houston*, 7 F. Supp. 3d at 291-92 (citations and internal quotation marks omitted).

With respect to the issue of plaintiff's knowledge of any such policy or custom, plaintiff argued that he had no reason to know of the County's "suicide watch policy that permitted officers to override the advice of mental health professionals" until the deposition of Dr. Troiano in 2011. (Pl.'s Summary Judgment Opp., ECF No. 114, at 14-16.) The County, citing plaintiff's August 8, 2007 Letter to the Court, argued that the letter clearly demonstrated his belief that such a policy existed:

> In August of 2007, during the early stage of this litigation, the plaintiff submitted a letter to the Court (attached as Exhibit C) in support of his claims. In his paragraph numbered 10 of the letter Mr. Houston specifically refers to the conduct of jail personnel placing him on suicide watch, that mental health didn't place him on suicide watch, and his belief that this was an administrative cover up. Further, in paragraph 14 of this letter Mr. Houston states that he is "obviously being punished" in relation to his placement on suicide watch. As stated above, this letter was filed with the Court in August of 2007 and clearly evidences that the plaintiff knew or should have known enough to claim the existence of a "policy or custom" so that he could sue the municipality.

(Defs.' Summary Judgment Mem., ECF No. 111-3, at 5 (quoting Plaintiff's August 8, 2007 Letter).) This Court denied summary judgment on this issue, concluding that this disputed issue of fact regarding plaintiff's knowledge of a policy or custom should be resolved by the jury. *See Houston*, 7 F. Supp. 3d at 292-94. After the evidence was presented to the jury at trial, the jury concluded that plaintiff proved by a preponderance of the evidence that, prior to January 24, 2010, he did not know, and should not have known, of any alleged policy, practice, or custom by Suffolk County to use suicide watch was punishment for inmates. (*See* Jury Verdict, ECF No. 165.) Thus, based upon the jury's verdict, the County's statute of limitations must fail based upon the Court's "delayed accrual" analysis.

However, having heard the trial evidence, the Court supplements that analysis with an additional alternative ruling that also makes clear that, <u>even under the County's own version of facts</u>, the County's statute of limitations argument must fail because the Amended Complaint is timely under Rule 15(c) of the Federal Rules of Civil Procedure because the Section 1983 claim against the County relates back to the date of plaintiff's initial complaint. Plaintiff made this alternative argument in its opposition to the summary judgment motion, and the Court agrees for the reasons set forth below.

It is well settled that "[i]f a complaint is amended to include an additional defendant after the statute of limitations has run, the amended complaint is not time-barred if it 'relates back' to a timely filed complaint." *VKK Corp. v. Nat'l Football League*, 244 F.3d 114, 128 (2d Cir. 2001). Rule 15(c) provides in relevant part that, when an amended pleading adds a new party, "[a]n amendment to a pleading relates back to the date of the original pleading . . . if Rule 15(c)(1)(B) is satisfied and if . . . the party to be brought in by amendment: (i) received such notice of the action that it will not be prejudiced in defending on the merits; and (ii) knew or should have known that the action would have been brought against it, but for a mistake concerning the proper party's identity." Fed. R. Civ. P. 15(c)(1)(C). The standard for Rule 15(c)(1)(B), which is a prerequisite to the adding a party under Rule 15(c), requires that "the amendment asserts a

13

claim . . . that arose out of the conduct, transaction, or occurrence set out – or attempted to be set out – in the original pleading." Fed. R. Civ. P. 15(c)(1)(B). As discussed below, all of these requirements are satisfied in this case.

First, although the County argues that the *Monell* claim regarding suicide watch is entirely unrelated to the original claim for excessive force, the Court disagrees. Based on plaintiff's pleading (and from the evidence at trial), there is no doubt that these events arose out of the same conduct or occurrence – namely, a dispute between plaintiff and Officer Cotter. More specifically, plaintiff alleged that both the assault by Officer Cotter on January 11, 2007, and his placement on suicide watch immediately thereafter, were punishment for a verbal dispute that plaintiff had with Officer Cotter the day before. Moreover, there was certainly evidence at trial from which a rational jury could credit the alleged link between the two events. Any suggestion that the alleged excessive force as punishment and the alleged use of suicide watch as punishment were unrelated events is entirely unsupported by the pleadings and the evidence at trial. Instead, based upon the allegations and the evidence, the Court concludes that these claims clearly arise out of the same conduct, transaction, and occurrence. Thus, the Rule 15(c)(1)(B) prerequisite has been met.

Second, with respect to Rule 15(c)(1)(c)(ii), the Court concludes that the County was on constructive notice of the allegations in the lawsuit by virtue of the fact that the Suffolk County Attorney represents both the individual defendants and Suffolk County itself. *See Maccarulo v. Gould*, 643 F. Supp. 2d 587, 594 (S.D.N.Y. 2009) ("[C]onstructive notice may be imputed to a new defendant through its attorney when the attorney also represented the official originally sued, so long as there is some showing that the attorneys knew that the additional defendants would be added to the existing suit." (internal quotation marks and citation omitted)); *accord Berry v. Village of Millbrook*, No. 09-CV-4234 (KMK), 2010 WL 3932289, at *5-6 (S.D.N.Y. Sept. 29, 2010); *see also Messina v. Mazzeo*, 854 F. Supp. 116, 146 (E.D.N.Y. 1994) ("It is also the case that the City of New York received adequate notice of the institution of the action; its attorney, the Corporation Counsel for the City of New York, was representing defendant Mazzeo when the first complaint was served.").

In addition, there is absolutely no prejudice to the County. In its reply on the summary judgment motion, the County suggested that it was prejudiced by the delay because, due to the passage of time, it was unable to uncover the reasons why plaintiff remained on suicide watch. (Defs.' Summary Judgment Reply at 8.) However, that argument is entirely unpersuasive. Even before the claim against the County was added, the plaintiff's allegations about being placed on suicide watch because of punishment were already part of the case against the individual defendants and, thus, the reasons for such placement would have been relevant on the claims against the individual defendants dating back to 2007. Moreover, it was abundantly clear from the testimony at trial that the County did not have a practice of keeping records of such decisions, nor is there any unavailable witness who could have provided additional testimony for the particular reasons as it relates to the plaintiff in this case. In short, the County has identified no prejudice from this amendment.

Finally, with respect to Rule 15(c)(1)(iii), if the County is correct that the August 8, 2007 Letter to the Court by plaintiff clearly evinces his knowledge of the existence of a

policy or custom, Suffolk County was certainly placed on notice that the action would have been brought against it, but for a mistake concerning the proper party's identity.[8] Obviously, contrary to the County's argument, the Court concluded that the letter did not clearly evince plaintiff's knowledge or understanding of a policy or custom, and that this disputed factual issue regarding the defendant's knowledge of a policy or custom needed to be decided by a jury. However, even though the letter did not reference a policy or custom (and, as the jury found, plaintiff was unaware of any such policy or custom at that juncture), the allegations by plaintiff in that August 2007 letter (including an alleged nexus between the altercation and his placement on suicide watch) certainly placed the County Attorney on notice that, but for plaintiff's lack of legal knowledge, his claim implicated the County's suicide policy and that a *Monell* claim would undoubtedly be necessary to prove the existence of any unconstitutional policy. In particular, the need for the plaintiff to sue the County should have been clear to the County Attorney from the August 2007 letter because plaintiff was not just challenging his placement on suicide watch, but his continuation on suicide watch after being cleared by the medical staff. (*See* August 8, 2007 Letter, ECF No. 111-6, at 2 ("[O]n 1/16/07 I saw Dr. Trino & he said Mental Health never placed me on suicide watch & he cleared me off of suicide watch. So why am I still on suicide watch a week later. It was 72 hours, more than 96 hours ago. So you tell me what's really going on? This is obvious (sic) administration trying to cover up a very immense brutality civil suit.").) In other words, given number of individuals who would be involved in continuing an inmate on suicide watch (including the Classification Unit), it was clear that the *pro se* plaintiff did not name the individual defendants involved in those decisions over time, and would need a *Monell* claim to prove (as he alleged) that "the administration" as a whole was involved in this decision. Thus, the Court concludes that, based on the August 8, 2007 letter, the County should have known it – as "the administration" – would have been sued regarding the placement on suicide as punishment, but for Houston's legal mistake.

The Court's decision on this issue is consistent with the Second Circuit's decision in *Soto v. Brooklyn Correctional Facility*, 80 F.3d 34 (2d Cir. 1996). *Soto* addressed the inverse situation – that is, the *pro se* plaintiff sued the Brooklyn Correctional Facility, but no individual defendants, in connection with a Section 1983 action alleging that his constitutional rights were violated because corrections officers returned plaintiff to housing with the same inmates who had previously stabbed him, and left him unsupervised, which resulted in a second attack against him. *Id*. at 35. The district court dismissed the *Monell* claim because of a failure to allege a policy or custom. However, the Second Circuit remanded the case for consideration of whether Soto should be permitted to amend the complaint to add the individual officers because it would "relate back" to the date he filed his original complaint. First, the Second Circuit noted that a "mistake" under Rule 15(c) could be a

---

[8] In fact, there is some evidence that the County Attorney's Office was liberally construing the case to be against the County. For example, in the Proposed Pretrial Order, filed on September 1, 2010, the County Attorney's Office had asserted the following defense (which would only apply to a *Monell* claim): "no policy, statement, ordinance, regulation or decision officially adopted and/or promulgated by the defendants or otherwise ratified by defendants authorized the deprivation of plaintiff's Constitutional rights." (*See* Proposed Pretrial Order, ECF No. 45-2, at 4.) In addition, in an Affidavit of Service for the Answer from September 24, 2007, the Suffolk County Attorney's Office inadvertently captioned the case as "Houston v. County of Suffolk, et al." (*See* Affidavit of Service, September 24, 2007, ECF No. 12.)

mistake of law or fact, and plaintiff's failure to name the individual defendants in that case constituted a "mistake concerning the identity of the proper party" under Rule 15(c). In particular, the Court explained:

> [U]nder section 1983, Soto *was* required to sue the individual defendants to maintain an action arising out of the January 1991 attack. His failure to do so cannot be considered a matter of choice; but for his mistake as to the technicalities of constitutional tort law, he would have named the officers in the original complaint, within the three-year limitation period, or at least named the superintendent of the facility and obtained the names of the responsible officers through discovery. . . . Soto did not know that he needed to name individual defendants, and his failure to do so, under the circumstances of this case, can be characterized as a "mistake" for purposes of Rule 15(c)(3).

*Id*. at 37. On the issue of prejudice, the Second Circuit remanded to the district court to determine whether, and when, the individual officers received notice of the suit against the Brooklyn Correctional Facility and whether they would be prejudiced if they were added to the suit. *Id*.

Although the instant case involves the failure to name the municipal entity (rather than the individual defendants), the analysis in *Soto* is instructive. Like the plaintiff in *Soto*, Houston clearly would have sued Suffolk County if he knew that, to hold "the administration" liable for this placement and continuation on suicide watch (as he alleged in his August 8, 2007 letter), he needed to sue the County.

In sum, this Court holds that the County's statute of limitations argument fails for two reasons: (1) as set forth in the March 27, 2014 Memorandum and Order, a Section 1983 claim against a municipality does not accrue until the plaintiff knew about, or at least had reason to know about, the policy or custom upon which he bases the claim (and the jury found that plaintiff did not know and should not have known, prior to January 24, 2010, that Suffolk County had a policy, practice or custom of using suicide watch as punishment for inmates); and (2) in the alternative, the *Monell* claim was timely because it relates back to the date of plaintiff's initial complaint against the individual defendants under Rule 15(c)(1)(C).

### III. CONCLUSION

For the foregoing reasons, the Court denies the defendants' motion for judgment as a matter of law.

SO ORDERED.

_____
JOSEPH F. BIANCO
United States District Judge

Dated: March 30, 2016
      Central Islip, NY

\* \* \*

Plaintiff is represented by Victor L. Hou, Christopher P. DeNicola, and Diarra M. Guthrie, Cleary Gottlieb Steen & Hamilton LLP, One Liberty Plaza, New York, NY 10006. Defendants are represented by Brian C. Mitchell, Suffolk County Attorney's Office, 100 Veterans Memorial Highway, Hauppauge, NY 11788.